1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

STEVEN VANCE, et al.,

    Plaintiffs,

        v.

AMAZON.COM INC.,

    Defendant.

CASE NO. C20-1084JLR

ORDER DENYING REMAINDER
OF AMAZON'S MOTION TO
DISMISS

## I.    INTRODUCTION

Before the court are two remaining portions of Defendant Amazon.com Inc.'s

("Amazon") motion to dismiss.  (*See* MTD (Dkt. #18).)  Plaintiffs Steven Vance and Tim

Janecyk (collectively, "Plaintiffs") oppose Amazon's motion.  (Resp. (Dkt. # 24).)  At the

direction of the court, both parties filed supplemental briefs to address (1) the

interpretation of "otherwise profit from" in § 15(c) of Illinois's Biometric Information

Privacy Act, 740 ILCS 14/1, *et seq.* ("BIPA"); and (2) whether Washington or Illinois

law should govern Plaintiffs' unjust enrichment claim.  (Def. Supp. Br. (Dkt. # 35); Pls.

Supp. Br. (Dkt. # 36); 3/15/21 Order (Dkt. # 34) at 23-24.)  The court has considered the motion, the supplemental briefing, the relevant portions of the record, and the applicable law.  The court additionally held oral arguments on April 13, 2021.  (*See* 4/13/21 Min. Entry (Dkt. # 37).)  Being fully advised, the court DENIES Amazon's motion to dismiss.

## II.    BACKGROUND

The court discussed the factual and procedural backgrounds of this case in its previous order on the other portions of Amazon's motion to dismiss.  (*See* 3/15/21 Order at 2-5.)  Thus, it only summarizes here the facts most relevant to the remaining portions of the motion.[1]

Plaintiffs are Illinois residents who uploaded photos of themselves to the photo-sharing website Flickr.  (Compl. (Dkt. # 1) ¶¶ 6-7, 28, 66-67, 75.)  Both were in Illinois when uploading the photos.  (*Id.* ¶¶ 66, 75.)  Unbeknownst to them, Flickr, through its parent company Yahoo!, compiled their photos along with hundreds of millions of other photographs posted on the platform into a dataset ("Flickr dataset") that it made publicly available for those developing facial recognition technology.  (*Id.* ¶¶ 29-32.)  International Business Machines Corporation ("IBM") created facial scans from the photographs in the Flickr dataset to create a new dataset called Diversity in Faces, which contained facial scans of Plaintiffs and other Illinois residents.  (*Id.* ¶¶ 42-43.)  Amazon obtained the Diversity in Faces dataset, including Plaintiffs' facial

//

---

[1] For the purposes of a motion to dismiss, the court accepts all well-pleaded allegations in Plaintiffs' complaint as true and draws all reasonable inferences in favor of Plaintiffs.  *See Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).

scans, from IBM.  (*Id.* ¶¶ 55-56.)  No company in this chain of events—Flickr, Yahoo!, IBM, or Amazon—informed or obtained permission from Plaintiffs for the use of their photographs or facial scans.  (*Id.* ¶¶ 30, 47, 71-72, 79-80.)

Amazon used the Diversity in Faces dataset to improve "the fairness and accuracy of its facial recognition products," which "improve[d] the effectiveness of its facial recognition technology on a diverse array of faces" and in turn made those products "more valuable in the commercial marketplace."  (*Id.* ¶¶ 64-65.)  Amazon's main facial recognition product is Amazon Rekognition, which "allows users to match new images of faces with existing, known facial images."  (*Id.* ¶ 55.)  Amazon Rekognition is "a fundamental cornerstone" of other Amazon consumer products and services, including Amazon's photo platform; Amazon's smart home systems and cameras, such as the Ring home security cameras; and Amazon's virtual assistant technology Alexa.  (*Id.* ¶ 56.)  Amazon also provides facial recognition technology and markets its Rekognition technology to law enforcement agencies, such as ICE and the FBI, to monitor individuals they consider "people of interest."  (*Id.* ¶ 57.)

Plaintiffs assert various claims in their class action suit against Amazon.  (*See generally id.*)  Relevant here are two of those claims: (1) violation of § 15(c) of BIPA (*id.* ¶¶ 106-12); and (2) unjust enrichment (*id.* ¶¶ 113-22).[2]  The court in its March 15, 2021, order found that additional briefing from the parties would be beneficial, as neither party meaningfully analyzed critical legal questions behind both claims in their original

---

[2] Amazon also challenged Plaintiffs' other claims, and the court resolved those challenges in its previous order.  (*See* 3/15/21 Order at 6-19, 23.)

1   briefing.  (3/15/21 Order at 20, 22-23.)  Specifically, the court ordered the parties to file

2   supplemental briefing on (1) "the definition of 'otherwise profit from' in the context of

3   § 15(c)"; and (2) "which state law should govern [Plaintiffs' unjust enrichment claim]

4   under Washington's 'most significant relationship' test." (*Id.*)  The parties subsequently

5   filed their supplemental briefing.  (*See* Pls. Supp. Br.; Def. Supp. Br.)

## III.   ANALYSIS

7       When considering a motion to dismiss under Rule 12(b)(6), the court construes the

8   complaint in the light most favorable to the nonmoving party.  *Livid Holdings Ltd. v.*

9   *Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).  The court must accept

10   all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff.

11   *Wyler Summit P'ship*, 135 F.3d at 661.  The court, however, is not required "to accept as

12   true allegations that are merely conclusory, unwarranted deductions of fact, or

13   unreasonable inferences."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th

14   Cir. 2001).  "To survive a motion to dismiss, a complaint must contain sufficient factual

15   matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

16   *v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

17   570 (2007)); *see also Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir.

18   2010).  "A claim has facial plausibility when the plaintiff pleads factual content that

19   allows the court to draw the reasonable inference that the defendant is liable for the

20   misconduct alleged."  *Iqbal*, 556 U.S. at 677-78.  Dismissal under Rule 12(b)(6) can be

21   based on the lack of a cognizable legal theory or the absence of sufficient facts alleged

22   under a cognizable legal theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699

1   (9th Cir. 1990).  Utilizing this standard, the court addresses the BIPA § 15(c) and unjust

2   enrichment claims in turn.

3   **A.**    **Profit Under BIPA § 15(c)**

4        Section 15(c) states that "[n]o private entity in possession of a biometric identifier

5   or biometric information may sell, lease, trade, or otherwise profit from a person's or a

6   customer's biometric identifier or biometric information."  740 ILCS 14/15(c).  The

7   parties disagree on how broadly to read "otherwise profit from."  Amazon argues that

8   "otherwise profit" requires "an entity receiving a pecuniary benefit in exchange for a

9   person's biometric data."  (MTD at 21; Def. Supp. Br. at 1.)  Plaintiffs propose that

10   "otherwise profit" means any use of biometric data that generates profits.  (Resp. at 21;

11   Pls. Supp. Br. at 3-4.)  The court finds that the proper interpretation of §15(c) falls

12   somewhere in between the two parties' proposals.

13        The court begins, as it must, with the statutory language.  *See Lacey v. Village of*

14   *Palatine*, 904 N.E.2d 18, 26 (Ill. 2009).  "Profit" as a verb means "to be of service or

15   advantage" or "to derive benefit."  *Profit*, Merriam-Webster.com, https://www.merriam-

16   webster.com/dictionary/profit (last accessed Apr. 1, 2021); *see also Profit*, Oxford

17   English Dictionary, https://www.oed.com/view/Entry/152098 (last accessed Apr. 1,

18   2021) (defining "profit" as "[t]o be of advantage or benefit to").  "Otherwise" means

19   "[i]n a different manner; in another way, or in other ways."  Black's Law Dictionary

20   1101 (6th ed. 1990).  Thus, in the context of § 15(c), sale, lease or trade are examples of

21   what the Illinois legislature had in mind as ways to derive benefit from biometric data,

22   *//*

1   but the statute leaves room for other ways resembling those examples to gain an

2   advantage.

3   When a statute, like § 15(c), "specifically describes several classes of persons or

4   things and then includes 'other persons or things,' the word 'other' is interpreted to mean

5   'other such like.'" *Pooh-Bah Enters., Inc. v. Cnty. of Cook*, 905 N.E.2d 781, 799 (Ill.

6   2009); *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 115 (2001) (discussing how

7   general terms that follow more specific terms "embrace only objects similar in nature to

8   those objects enumerated by the preceding specific words"). This "cardinal rule of

9   statutory construction" is known as *ejusdem generis*, and it is a "common drafting

10  technique" to save the legislature "from spelling out in advance every contingency in

11  which the statute could apply."[3]  *Pooh-Bah Enters.*, 905 N.E.2d at 799 (quoting 2A N.

12  Singer & J. Singer, Sutherland on Statutory Construction § 47:17, at 370-73 (7th ed.

13  2007)) (internal quotation marks omitted). Thus, the general catchall is not "given [its]

14  full and ordinary meaning" because to do so would render the specific words superfluous.

15  *Id.*; *see also id.* ("If the legislature had meant the general words to have their unrestricted

16  sense, it would not have used the specific words.").

17  Accordingly, applied to § 15(c), "otherwise profit" should be interpreted in light of

18  the terms that precede it:  sell, lease and trade.  *See* 740 ILCS 14/15(c).  All three of these

19  terms contemplate a transaction in which an item is given or shared in exchange for

20

21  _____

[3] Contrary to Plaintiffs' contention, *ejusdem generis* applies equally to verbs.  (*See* Resp.
at 21.)  Courts have applied this canon to actions as well as persons or things.  *See, e.g.*, *Epic Sys.*

22  *Corp. v. Lewis*, 138 S. Ct. 1612, 1625 (2018) (applying *ejusdem generis* canon to "form[ing],
join[ing], or assist[ing] labor organizations"); (Reply (Dkt. # 25) at 10-11.)

something of value.  *See Sell*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/sell (last accessed Mar. 31, 2021) (defining "sell" as "to give up . . . to another for something of value"); *Lease*, Oxford English Dictionary, https://www.oed.com/view/Entry/106734 (last accessed Mar. 31, 2021) (defining "lease" as "[t]o grant the possession or use of (lands, etc.) by a lease"); *Trade*, Oxford English Dictionary, https://www.oed.com/view/Entry/204275 (last accessed Mar. 31, 2021) (defining "trade" as "[t]o exchange (goods, commodities, etc.) on a commercial basis; to cause to change hands").  Similarly then, while "profit" may have a broader "ordinary meaning," *see Pooh-Bah Enters.*, 905 N.E. 2d at 799, in the context of the enumerated terms, "otherwise profit" encompasses commercial transactions—such as a sale, lease or trade—during which the biometric data is transferred or shared in return for some benefit.

Thus, § 15(c) regulates transactions with two components:  (1) access to biometric data is shared or given to another; and (2) in return for that access, the entity receives something of value.  As to the first component, the biometric data itself may be the product of the transaction, such as in a direct sale.  Or the biometric data may be so integrated into a product that consumers necessarily gain access to biometric data by using the product or service.  As to the second component, the court disagrees with Amazon's contention that the biometric data must be provided "in exchange for money." (*See* MTD at 21.)  Not all the enumerated examples involve monetary benefits.  For instance, one could trade for something of value that is not money.  Thus, it does not follow that "otherwise profit" must also be limited to a pecuniary benefit.  Section 15(c) //

1    prohibits the commercial dissemination of biometric data for some sort of gain, whether

2    pecuniary or not.

3        This reading of § 15(c) aligns with the legislative intent expressed in BIPA. *See*

4    740 ILCS 14/5. BIPA was designed to "regulate and promote, not inhibit," the use of

5    biometric technology. *See Vigil v. Take-Two Interactive Software, Inc.*, 235 F. Supp. 3d

6    499, 512 n.9 (S.D.N.Y. 2017). The legislature recognized the benefits of using

7    biometrics but understood that if biometrics are "compromised, the individual has no

8    recourse, is at heightened risk for identity theft, and is likely to withdraw from biometric

9    facilitated transactions." 740 ILCS 14/5(a), (c). To counteract that public "wear[iness]"

10   and to encourage those who may be "deterred from partaking in biometric

11   identifier-facilitated transactions," the legislature enacted BIPA's additional regulations.

12   *Id.* 14/5(d)-(e), (g). Thus, BIPA was not intended to stop all use of biometric technology;

13   instead, it set a standard for the safe collection, use, and storage of biometrics, including

14   protecting against the public's main fear that their biometric data would be widely

15   disseminated. Section 15(c) achieves that goal by prohibiting a market in the transfer of

16   biometric data, whether through a direct exchange—sale, lease or trade—or some other

17   transaction where the product is comprised of biometric data.

18       To that end, Plaintiffs are correct that BIPA, and § 15(c) in particular, aims to

19   "eliminate the incentive" behind marketing biometric data. (*See* Pls. Supp. Br. at 2-3

20   (citing *Thornley v. Clearview AI, Inc.*, 984 F.3d 1241, 1247 (7th Cir. 2021) (analyzing

21   standing under § 15(c)).) But Plaintiffs' argument goes astray when it assumes that BIPA

22   sought "to eliminate the incentive for private entities to collect, possess or disseminate

1    biometrics" in any fashion.  (*Id.* at 2.)  Not so, as BIPA's legislative intent makes clear.

2    *See* 740 ILCS 14/5(a).  Instead, BIPA sought to control the unauthorized collection,

3    possession or dissemination of biometric data, and § 15(c) operates to remove one main

4    incentive of sharing biometric data—to exchange it for some benefit.[4]

5            Indeed, Plaintiffs' reading of § 15(c)—prohibition of any use of biometric data

6    that brings a benefit—would lead to absurd results that contravene BIPA itself.  As

7    acknowledged by Plaintiffs in oral argument, § 15(c) is a flat-out prohibition.  *See* 740

8    ILCS 14/15(c).  In other words, unlike the collection, possession or dissemination of

9    biometric data, no private entity may "otherwise profit" from biometric data even if they

10   inform and obtain permission from the subject.  *Compare, e.g.*, 740 ILCS 14/15(d)

11   (allowing dissemination of biometric data with consent from subject), *with* 740 ILCS

12   14/15(c) (containing no exceptions).  Taken to its logical end, Plaintiffs' reading of

13   § 15(c) would prohibit the sale of any product containing biometric technology because

14   any such feature had to be developed or built with biometric data.  (*See* Compl. ¶¶ 15,

15   24-25 (describing how all facial recognition technology utilizes biometric data).)  For

16   instance, a company could not sell biometric timekeeping systems—or any product with

17   a biometric feature—because it was presumably developed using biometric data.

18   //

19   _____

20        [4] Although dicta, *Thornley* makes clear that it interpreted § 15(c) to "prohibit[] the
     operation of a market in biometric [data]," not all technology based on biometric data.  984 F.3d
     at 1247.  Analogizing to other laws such as those prohibiting the sale of migratory birds, the

21   Seventh Circuit recognized that these laws aim to "eliminate the market for such material." *Id.*
     In other words, the law removes an incentive behind the dissemination of these materials to
     control the spread of that material.  The same holds true here.  By prohibiting for-profit

22   transactions involving biometric data, BIPA aims to control the spread of biometric data.

1    Similarly, no company could use that biometric timekeeping system because it uses

2    employees' biometric data to streamline operations and decrease costs.  Nothing—not

3    BIPA's statutory language, its stated intent, or any authority analyzing § 15(c)—supports

4    such a broad reading.[5]

5         At oral argument, Plaintiffs relied on the exemptions laid out in § 25 of BIPA as a

6    limiting principle, but that section does not resolve the absurdity discussed above.

7    Section 25 provides limited scenarios that are exempt from BIPA.  *See* 740 ILCS § 14/25.

8    For instance, the act shall not apply "to a financial institution or an affiliate of a financial

9    institution that is subject to Title V of the federal Gramm-Leach Bliley Act of 1999" or to

10   "a contractor, subcontractor, or agency of a State agency or local unit of government

11   when working for that [entity]."  *Id.* 14/25(c), (e).  But this provision does not reach the

12   scenarios discussed above, where a private entity necessarily uses biometric data—even

13   if lawfully obtained—to develop biometric technology.  Nor does § 25 alter the intent

14   expressed in § 5 that BIPA did not intend to stop all use of biometric technology,

15   especially those that BIPA recognized as potentially beneficial.  *See* 740 ILCS 14/5.

16   Adopting Plaintiffs' reading would do just that.

17   //

18   //

19

20        [5] Courts that have opined on the scope of § 15(c) in the context of standing have
     generally rejected such a broad reading.  For instance, in *Hazlitt v. Apple Inc.*, --- F.3d ----, 2020
     WL 6681374 (S.D. Ill. 2020), the court noted that "by its plain language," § 15(c) does not
21   prohibit "the general sales of devices equipped with facial recognition technology."  *Id.* at *7.
     Similarly, in *Vigil*, the court explained that "otherwise profiting" is best read as "a catchall for
     prohibiting commercially transferring biometric [data]," which does not reach the sale of a
22   product with a biometric-related feature.  235 F. Supp. 3d at 512 n.9.

1    Reading § 15(c) to prohibit for-profit transactions of biometric data also comports

2  with the one court to have analyzed § 15(c)'s reach.  In *Flores v. Motorola Solutions,*

3  *Inc.*, No. 1:20-cv-01128, 2021 WL 232627 (N.D. Ill. Jan. 8, 2021), plaintiffs alleged that

4  the defendant used biometric data to develop a database that allowed customers to search

5  for facial matches.  *Id.* at *3.  Thus, using the product—"compar[ing] novel images to the

6  database images to find facial matches"—necessarily allowed customers to gain access to

7  the underlying biometric data.  *See id.*  In other words, without the identified biometric

8  data, there would be no product to speak of.  *See id.*  Concluding that "biometric data is a

9  necessary element to Defendant's business model," the court declined to say that this

10  activity does not constitute "otherwise profiting from" biometric data.  *Id.*  *Flores*

11  illustrates one example of how a company could "otherwise profit" from biometric data

12  without directly selling it: by creating technology that is so intertwined with the biometric

13  data that marketing the technology is essentially disseminating biometric data for profit.

14    *Flores* is directly analogous to the allegations here.  Plaintiffs allege that amongst

15  its many uses of facial recognition technology, Amazon's Rekognition "allows users to

16  match new images of faces with existing, known facial images 'based on their visual

17  geometry.'" (Compl. ¶ 55.)  Rekognition, and its face-matching feature, is then

18  incorporated into many other Amazon products.  (*Id.* ¶ 56.)  Amazon's customers,

19  including law enforcement agencies, utilize Rekognition to "monitor individuals they

20  consider 'people of interest'" in their criminal investigations.  (*Id.* ¶ 57.)  Like in *Flores*,

21  these allegations support the inference that the biometric data is itself so incorporated into

22  Amazon's product that by marketing the product, it is commercially disseminating the

1    biometric data.  (*See id.* ¶¶ 55-57); *see* 2021 WL 232627, at *3.  These allegations also

2    support the inference that Amazon received some benefit from the biometric data through

3    increased sales of its improved products.  (*See* Compl. ¶ 65.)  It is certainly possible that

4    with further factual development, it is discovered that Amazon does not so integrate

5    biometric data, or the Diversity in Faces database in particular, into its products.  But at

6    this stage, because Plaintiffs' factual allegations allow for the reasonable inference that

7    selling Amazon's products necessarily shares access to the underlying biometric data in

8    exchange for some benefit to Amazon, the court concludes that Plaintiffs have

9    sufficiently stated a claim under § 15(c).  *See* 2021 WL 232627, at *3.

10   **B.    Unjust Enrichment**

11           As the court articulated in its previous order, Amazon challenges Plaintiffs' unjust

12   enrichment claim as insufficiently pleaded under Washington law, but Plaintiffs maintain

13   that the claim is sufficiently pleaded under Illinois law.  (3/15/21 Order at 21.)  The court

14   concluded that under step one of Washington's two-step approach to choice-of-law

15   questions, an actual conflict between Washington and Illinois law exists over whether

16   Plaintiffs must plead that they suffered an economic expense distinct from a privacy

17   harm.  (*Id.* at 21-22.)  Because an actual conflict exists, the court must, at step two,

18   determine which state has the "most significant relationship" to the instant claim.  (*Id.* at

19   22.)  Washington's "most significant relationship" test also consists of two steps.  *Coe v.*

20   *Philips Oral Healthcare Inc.*, No. C13-0518MJP, 2014 WL 5162912, at *3 (W.D. Wash.

21   Oct. 14, 2014).  First, the court considers the states' relevant contacts to the cause of

22   action.  *Johnson v. Spider Staging Corp.*, 555 P.2d 997, 1000-01 (Wash. 1976).  Second,

1    if those contacts are evenly balanced, the court considers "the interests and public

2    policies of [the two] states and . . . the manner and extent of such policies as they relate to

3    the transaction in issue." *Id.* at 1001.

4         At the outset, the parties disagree on which contacts should guide the analysis.

5    Amazon argues that Restatement § 221 governs restitution claims, such as Plaintiffs'

6    unjust enrichment claim.  (Def. Supp. Br. at 5.)  Plaintiffs urge for application of

7    Restatement § 152, which governs invasion of privacy claims, or alternatively,

8    Restatement § 145, which applies generally to torts.  (Pls. Supp. Br. at 7.)  The court

9    determines that § 221 is most applicable here.  The commentary to § 221 plainly states

10   that it "applies to claims, which are based neither on contract nor on tort, to recover for

11   unjust enrichment."  Restatement (Second) of Law on Conflict of Laws § 221(1) cmt. a.

12   Although Plaintiffs are correct that the underlying issues involve privacy, Plaintiffs do

13   not, as in their cited authority, bring an invasion of privacy tort claim.  (*See* Pls. Supp. Br.

14   at 8); *see, e.g.*, *Cooper v. Am. Exp. Co.*, 593 F.2d 612, 612 (5th Cir. 1979) (invasion of

15   privacy claim); *York Grp. Inc. v. Pontone*, No. 10-cv-1078, 2014 WL 896632, at *33

16   (W.D. Pa. Mar. 6, 2014) (tortious surveillance claim).  Indeed, Plaintiffs provide no

17   authority applying §§ 152 or 145 to an unjust enrichment claim.  (*See* Pls. Supp. Br.)

18        Restatement § 221 provides that:

19        In actions for restitution, the rights and liabilities of the parties with respect
          to the particular issue are determined by the local law of the state which, with
20        respect to that issue, has the most significant relationship to the occurrence
          and the parties under the principles stated in § 6.

21

22   //

Restatement (Second) of Law on Conflict of Laws § 221(1).  Section 6, in turn, identifies

the following principles as relevant to the choice-of-law analysis:

> (a)   The needs of the interstate and international systems,
> (b)   The relevant policies of the forum,
> (c)   The relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d)   The protection of justified expectations,
> (e)   The basic policies underlying the particular field of law,
> (f)   Certainty, predictability and uniformity of result, and
> (g)   Ease in the determination and application of the law to be applied.

Restatement (Second) of Law on Conflict of Laws § 6(2).  In applying these principles of

§ 6, the following contacts should be taken into account:

> (a)   The place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,
> (b)   The place where the benefit or enrichment was received,
> (c)   The place where the act conferring the benefit or enrichment was done,
> (d)   The domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (e)   The place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment.

Restatement (Second) of Law on Conflict of Laws § 221(2).  The court's approach is not

merely to count contacts but rather to consider which contacts are the most significant

and where those contacts are found.  *Johnson*, 555 P.2d at 1000.

    Three of these contacts identified by § 221 are neutral in the unique circumstances

presented by this case and thus have little bearing on the court's choice-of-law analysis.

The parties' relationship is not centered in any one place, as Plaintiffs did not directly

*//*

ORDER - 14

1    interact with Amazon or its products.[6]  (*See* Compl. ¶¶ 60-63; 68-71); *see Veridian Credit*

2    *Union v. Eddie Bauer, LLC*, 295 F. Supp. 3d 1140, 1154 (W.D. Wash. 2017) (finding this

3    factor to bear "little, if any, weight" when parties did not contract with one another).

4    Second, there is no "physical thing, such as land or a chattel," related to the enrichment.

5    Restatement (Second) of Law on Conflict of Laws § 221(2)(e).  Instead, Plaintiffs'

6    allegations revolve around the benefits obtained from intangible notions of biometric data

7    and facial recognition technology.  Thus, this factor, too, is neutral.

8         Lastly, the place where the benefit was received is also neutral.  Amazon is based

9    in Washington and thus would have received benefits in Washington from increased

10   product sales.  (Compl. ¶ 8; *see* Def. Supp. Br. at 7.)  However, Plaintiffs also allege that

11   Amazon incorporates its facial recognition technology into its "largest consumer products

12   and services around the world" and thus allows the reasonable inference that Amazon

13   received benefits in many places.  (Compl. ¶ 56.)  Moreover, Amazon is "the largest

14   provider of facial recognition technology to law enforcement agencies," including ICE,

15   the FBI, and more than 1,300 law enforcement agencies across the country.  (*Id.* ¶ 57.)

16   Thus, Amazon's nation-wide reach, as alleged, supports the inference that the place

17   where the benefit was received may span many states.  (*See id.*)  Thus, although usually

18   of greatest importance when there is no relationship between the parties, this factor also

19   //

20   

21   _____

     [6] The enrichment Amazon allegedly received was unjust specifically because of the lack
     of relationship with Plaintiffs, as the unjustness stems from the lack of consent from Plaintiffs in
22   Illinois.  Thus, it is unclear whether this first factor, which is identified as the contact "given the
     greatest weight," would ever be applicable in cases such as these.  *See* Restatement (Second) of
     Law on Conflict of Laws § 221(2) cmt. d.

1  does not weigh strongly in favor of one state over another.  *See* Restatement (Second) of

2  Law on Conflict of Laws § 221(2)(d) (assigning this factor "little or no weight" when

3  place where benefit was received "bears little relation to the occurrence . . . or where this

4  place cannot be identified").

5          The two remaining factors lean towards application of Illinois law.  The place

6  where the act conferring the benefit occurred will be given "[p]articular weight" if it

7  differs from the place where the benefit was received or if the place where the benefit

8  was received cannot be identified.  Restatement (Second) of Law on Conflict of Laws

9  § 221(2) cmt. d.  Plaintiffs conferred the benefit in Illinois, as they and all putative class

10  members are Illinois residents who uploaded Illinois-created content in Illinois.  (Compl.

11  ¶¶ 6-7, 66-70, 74-77, 83.)  Although there are other acts in the chain of events leading to

12  Amazon benefiting off of Plaintiffs' biometric data, including actions Amazon allegedly

13  took itself (*see* Def. Supp. Br. at 7), the core of the benefit lies in Plaintiffs providing

14  images of their faces—albeit unknowingly—that ultimately improved Amazon's products

15  (*see* Compl. ¶¶ 62-65, 114-17).  Thus, this factor, which is assigned particular weight

16  given the neutrality of the place where the benefit was received, counsels application of

17  Illinois law.  *See* Restatement (Second) of Law on Conflict of Laws § 221(2) cmt. d.

18          Moreover, the domicil and place of business of the parties tip towards Illinois.

19  Although Amazon is headquartered in Washington (*id.* ¶¶ 8-9), "[t]he fact that one of the

20  parties is domiciled in a particular state is of little significance" alone, *see Veridian*, 295

21  F. Supp. 3d at 1154; *see also* Restatement (Second) of Law on Conflict of Laws § 221(2)

22  cmt. d ("The fact . . . that one of the parties is domiciled . . . in a given state will usually

1   carry little weight of itself."). Instead, the importance of these locations "depends largely

2   upon the extent to which they are grouped with other contacts." Restatement (Second) of

3   Law on Conflict of Laws § 221(2) cmt. d. Here, several contacts are grouped in Illinois:

4   Plaintiffs are domiciled there, the benefiting act (the sharing of facial images) was done

5   there, and Amazon presumably conducts business there related to the enrichment at issue.

6   *See id.* ("The state where these contacts are grouped is particularly likely to be the state

7   of the applicable law if . . . the benefiting act was done there."); (Compl. ¶¶ 6-7, 58-63,

8   68-71.) Aside from Amazon's headquarters, the allegations largely do not concern

9   Washington. (*See* Compl.) Accordingly, this factor favors application of Illinois law.

10          In sum, and in light of the guidance that the court is to evaluate these contacts with

11   respect to the particular issues presented, the court concludes that Illinois has the most

12   significant relationship to this occurrence. *See* Restatement (Second) of Law on Conflict

13   of Laws § 221. Of particular significance is the place of the benefiting act and the

14   grouping of Plaintiffs' domicile, residence and Amazon's business in that place: Illinois.

15   *See id.*; (Compl. ¶¶ 6-7, 54-57, 66-70, 74-77.) The remaining contacts are neutral or

16   carry little weight to the court's analysis.

17          The conclusion that Illinois has the most significant relationship here is bolstered

18   by consideration of the underlying principles of § 6. First, the consideration of the two

19   states' relevant policies leans towards Illinois. *See* Restatement (Second) of Law on

20   Conflict of Laws § 6(b)-(c). While Amazon is correct that Washington has its own

21   biometrics statute that differs from BIPA (*see* Def. Supp. Br. at 8-9), that difference in

22   itself encourages the application of Illinois law for Plaintiffs and a putative class who are

1    all Illinois residents.  Illinois made clear through BIPA that it has substantial interest in

2    protecting its residents' biometric data, even if the harm is inflicted by an out-of-state

3    corporation.  *See In re Facebook Biometric Info. Privacy Litig.*, 185 F. Supp. 3d 1155,

4    1169-70 (N.D. Cal. 2016).  Indeed, Illinois's recognition of both the role of major

5    national corporations as well as the unknown nature of the full ramifications of biometric

6    technology underscores Illinois's great interest in protecting its citizenry against a

7    multitude of harms stemming from a privacy violation, including if a corporation unjustly

8    enriches itself off of Illinois residents' biometric data.  *See* 740 ILCS 14/5(b), (f).

9    Washington's interest, on the other hand, is relatively insignificant in comparison, as

10   illustrated by the lack of Washington's connection to the majority of substantive

11   allegations in Plaintiffs' complaint.  *See McNamara v. Hallinan*, No. 2:17-cv-02967-

12   GMN-BNW, 2019 WL 4752265, at *6 (D. Nev. Sept. 30, 2019) (finding state's lack of

13   significance to substantive allegations suggests that its public policy interest is minimal).

14          Certainty, predictability and uniformity of result, as well as the ease in the

15   determination of the law to be applied, tip towards Illinois as well.  *See* Restatement

16   (Second) of Law on Conflict of Laws § 6(f)-(g).  In cases involving privacy, the

17   Restatement recognizes that both these values are furthered by choosing the state where

18   the invasion of privacy occurred, as that location "will usually be readily ascertainable."

19   *Cf.* Restatement (Second) of Law on Conflicts of Law § 152 cmt. b (analyzing § 6

20   principles).  That is especially true here, as this court and others have opined on the

21   difficulty of pinpointing where events occurred in BIPA cases.  (*See* 3/15/21 Order at

22   6-7); *see, e.g.*, *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1101-02 (N.D. Ill. 2017).

1    Moreover, uniformity concerns for the multitude of cases brought by Illinois residents

2    across the country again counsel application of Illinois law.  *See Vance v. IBM Corp.*, No.

3    20 C 577, 2020 WL 5530134, at *5 (N.D. Ill. Sept. 15, 2020) ("*IBM*") (applying Illinois

4    law to IBM's actions).

5           Amazon relies largely on protection of its justified expectations that Washington's

6    biometrics law would apply.  (Def. Supp. Br. at 8-9.)  But in restitution cases, the

7    protection of justified expectations "plays a less important role in the choice-of-law

8    process with respect to some of the areas covered by the field of restitution" because "the

9    purpose of restitution is to do justice to the parties after an event whose occurrence one of

10   the parties, at least, will usually not have foreseen."  Restatement (Second) of Law on

11   Conflict of Laws § 221(1) cmt. b.  Even if justified expectations carried greater

12   importance, Amazon's expectation of relying on Washington law when it is a national

13   corporation and does extensive business nationwide is outweighed by Illinois residents'

14   justified expectation that their state's laws will protect their privacy interests, especially

15   as their relevant actions do not reach into Washington.  (*See* Compl. ¶¶ 55-57, 66-68,

16   74-76.)  Thus, this principle does not dictate the application of Washington law.

17          Assuming, *arguendo*, that the foregoing contacts were evenly balanced, the court

18   would still apply Illinois law under the second step of Washington's choice-of-law

19   analysis.  "If the contacts are evenly balanced, the second step of the analysis involves an

20   evaluation of the interests and public policies of the concerned states to determine which

21   state has the greater interest in determination of the particular issue."  *Zenaida-Garcia v.*

22   *Recovery Sys. Tech.*, 115 P.3d 1017, 1020 (Wash. 2005). This second step "turns on the

1   purpose of the law and the issues involved." *Veridian*, 295 F. Supp. 3d at 1155.  As

2   discussed above, Illinois has the paramount interest in applying its law here.  Application

3   of its unjust enrichment law, which recognizes privacy harms, aligns with and strengthens

4   Illinois's general regulatory scheme regarding privacy interests.  *See IBM*, 2020 WL

5   5530134, at *5.  Although applying Washington unjust enrichment law would not cause

6   Illinois to suffer "a complete negation of its biometric privacy protections," the court

7   concludes that applying Washington law would cause Illinois to suffer greater

8   impairment of its policies than if the other state's law is applied.  *See In re Facebook*, 185

9   F. Supp. 3d at 1170.

10          Having determined that Illinois law applies to Plaintiffs' unjust enrichment claim,

11   the remainder of the analysis becomes straightforward.  As the court previously

12   articulated, under Illinois law, "the assertion that plaintiffs are 'exposed to a heightened

13   risk of privacy harm' and 'have been deprived of their control over their biometric data'

14   sufficiently states an unjust enrichment claim."  (3/15/21 Order at 21-22 (quoting *IBM*,

15   2020 WL 5530134, at *5).)  Because Plaintiffs have so pleaded (*see* Compl. ¶ 114), they

16   have sufficiently stated a claim for unjust enrichment under Illinois law.[7]

17   //

18   //

19

20          [7] Amazon makes two additional arguments for dismissal:  (1) that the unjust enrichment
claim must be dismissed because the BIPA claims should be dismissed; and (2) that unjust
enrichment is not available as Plaintiffs have a statutory remedy.  (MTD at 22-23.)  The court
does not address the first argument because Plaintiffs' BIPA claims survive.  (*See* 3/15/21

21   Order.)  As for the second argument, Plaintiffs may set forth an unjust enrichment claim
alternatively, and thus dismissal is not warranted.  *See* Fed. R. Civ. P. 8(e)(2); *Quadion Corp. v
Mache*, 738 F. Supp. 270, 278 (N.D. Ill. 1990).

22

1    In sum, the court determines that Illinois has the most significant relationship with

2  the occurrence here under both the contacts analysis laid out in Restatement § 221 and

3  the general principles listed in § 6.  Moreover, even if the contacts were balanced, Illinois

4  has the greater interest in determining this particular issue.  Applying Illinois law,

5  Plaintiffs have sufficiently pleaded their unjust enrichment claim, and Amazon's

6  remaining arguments are unavailing.  Thus, the court denies Amazon's motion to dismiss

7  Plaintiffs' unjust enrichment claim.

8                              **IV.    CONCLUSION**

9    For the foregoing reasons, the court DENIES the remainder of Amazon's motion

10  to dismiss (Dkt. # 18).

11    Dated this 14th day of April, 2021.

12

13    _____

14    JAMES L. ROBART
      United States District Judge

15

16

17

18

19

20

21

22

ORDER - 21