THE HONORABLE JAMES L. ROBART

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

STEVEN VANCE and TIM JANECYK, for
themselves and others similarly situated,

Plaintiffs,

v.

AMAZON.COM, INC.,

Defendant.

No. 2:20-cv-01084-JLR

**PLAINTIFFS' BRIEF IN
OPPOSITION TO
DEFENDANT'S RENEWED
MOTION FOR SUMMARY
JUDGMENT**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

**TABLE OF CONTENTS**

INTRODUCTION.................................................................................................. 1

STATEMENT OF FACTS PRECLUDING SUMMARY JUDGMENT ................................ 2

I.    The Illinois Biometric Information Privacy Act. ........................................... 2

II.   Plaintiffs Steven Vance and Tim Janecyk. .................................................. 2

III.  Amazon Rekognition. ................................................................................ 3

IV.   Criticism of Bias in Facial Recognition Software, Including Rekognition. ...... 3

V.    The Diversity in Faces Dataset. ................................................................. 4

VI.   Defendant Obtained the DiF Dataset to Improve Rekognition.......................... 5

        A.     Defendant's Rekognition Team. .................................................... 5

        B.     Defendant's Prioritization of Rekognition's Facial Recognition Capabilities. ....... 5

        C.     The Rekognition Team's Obtainment of the DiF Dataset. ................... 6

        D.     The Rekognition Team's Use of the DiF Dataset to Improve Rekognition. .......... 7

ARGUMENT .................................................................................................... 10

I.    Legal Standard ...................................................................................... 10

II.   Neither the Extraterritoriality Doctrine nor the Dormant Commerce Clause Bar
      Plaintiffs' Claims. ................................................................................. 10

        A.     BIPA, as Applied, Does Not Violate Illinois' Extraterritoriality Doctrine........... 10

                1.     The Factual Record Underscores the Propriety of the
                       Court's Prior Ruling.................................................... 10

                2.     Plaintiffs' Claims Do Not Require Any Extraterritorial Application of
                       BIPA. ...................................................................... 12

        B.     The Dormant Commerce Clause Does Not Bar Plaintiffs' claims. ...................... 15

III.  BIPA § 15(b) Applies to Defendant's Download, Storage, and Use of the DiF Dataset. 19

        A.     Law of the Case Bars This Argument.................................................. 19

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - i

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

B.  Defendant's Proposed Limitation Lacks Any Persuasive Legal Basis. ................ 20

C.  The Record Does Not Support Defendant's Factual Contention. .......................... 22

IV.  The Court Should Not Grant Summary Judgment on Plaintiffs' BIPA § 15(c) Claim. ... 23

V.  Factual Disputes Preclude Summary Judgment on Plaintiffs' Unjust Enrichment Claim. ........................................................................................................... 24

CONCLUSION ................................................................................................................. 24

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - ii

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

### INTRODUCTION

Defendant Amazon.com, Inc. ("Amazon" or "Defendant") seeks summary judgment on all claims but mostly rehashes arguments the Court rejected in denying their motion to dismiss, and falls far from meeting its burden. The factual record developed in discovery, construed in Plaintiffs' favor, precludes any finding that Defendant is entitled to judgment as a matter of law. That record shows Defendant made extensive use of the biometric data of Illinois Plaintiffs Steven Vance and Tim Janecyk (collectively, "Plaintiffs"), derived from photos they took and uploaded in Illinois, including in connection with improving its facial recognition software. In doing so, Defendant failed to give the notice to and obtain consent from Plaintiffs as required by law, invading Plaintiffs' privacy and causing them harm – also all in Illinois.

Defendant's main arguments are that Illinois' Biometric Information Privacy Act ("BIPA"), 740 Ill. Comp. Stat. 14/1, *et seq.*, does not regulate its alleged conduct here because BIPA lacks extraterritorial reach, and because holding it liable for contravening BIPA would violate the dormant Commerce Clause. But Defendant's arguments rest on a skewed version of the factual record which, when properly construed, contains all of the facts this Court has already found sufficient to overcome Defendant's arguments. The legal support for Defendant's arguments fails also, as it asks the Court to follow an outlier out-of-circuit and factually distinguishable opinion, ignoring the great weight of the case law. Defendant also contends that it would be absurd to interpret BIPA's reach to cover its conduct here – an argument barred by the law of the case doctrine, unmoored from any textual support and, again, against the clear consensus of precedent. And the factual record similarly demonstrates that Defendant is not entitled to summary judgment on Plaintiffs' BIPA § 15(c) and unjust enrichment claims.

For these reasons, elaborated further below, Defendant's motion should be denied.

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 1

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

**STATEMENT OF FACTS PRECLUDING SUMMARY JUDGMENT**

**I.      The Illinois Biometric Information Privacy Act.**

BIPA strictly regulates an individual's biometric identifiers and biometric information (collectively, "Biometric Data"). It prohibits a private entity from, among other things, collecting, capturing or otherwise obtaining an individual's Biometric Data without providing written notice and obtaining a written release. *See* 740 Ill. Comp. Stat. 14/15(b). In enacting BIPA, the Illinois General Assembly recognized the sensitive nature of Biometric Data, which is "biologically unique to the individual," thus precluding any recourse once it is compromised. 740 Ill. Comp. Stat. 14/5(c). The General Assembly also found that the "public welfare, security, and safety will be served by regulating the collection, use, safeguarding, handling, storage, retention, and destruction of biometric identifiers and information." 740 Ill. Comp. Stat. 14/5(g).

**II.     Plaintiffs Steven Vance and Tim Janecyk.**

Plaintiff Steven Vance has lived in Chicago, Illinois since approximately 2006. Ex. 1 (Vance Dep.) at 9:15-10:9.[1] Plaintiff Tim Janecyk has lived in Tinley Park, Illinois since 1999. Ex. 2 (Janecyk Dep.) at 39:7-40:1. At relevant times, Vance and Janecyk had Flickr accounts to which they respectively uploaded approximately 37,000 and 15,000 photos. Ex. 1 at 120:9-122:9, 255:1-7; Ex. 2 at 44:9-11; 49:16-50:11. Flickr is a website to which users can upload photos. Ex. 3 (Verizon Dep.) at 34:24-35:19. Included in Plaintiffs' Flickr photos and those at issue here were photos they took in Illinois. Ex. 4 (Vance Interrog. Ans.) at Nos. 1-2; Ex. 36 (Vance Chicago photo) at 3-4; Ex. 1 at 153:4-16; Ex. 5 (Janecyk Interrog. Ans.) at Nos. 1-2; Ex. 2 at 97:14-20. It was Vance's and Janecyk's habit or routine practice to upload photos to their Flickr accounts from their homes in Illinois. Ex. 1 at 255:8-16; Ex. 2 at 81:13-21, 97:21-98:1.

---

[1] Unless otherwise noted, all citations to exhibits are to those exhibits attached to the Declaration of Scott R. Drury filed contemporaneously with this brief. Citations to exhibits are to the page numbers of the exhibits without including the cover page, unless the citation has the prefix "CM/ECF."

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 2

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

Plaintiffs restricted the use of the photos they uploaded to Flickr in two ways: (a) via a Creative Commons license; and (b) limiting who could view the photos online. *See* Ex. 1 at 75:17-76:19, 206:1-21; Ex. 6 (Vance Creative Commons license); Ex. 2 at 49:16-50:11, 100:18-102:3, 138:4-24; Ex. 7 (Janecyk Creative Commons license). The Creative Commons licenses restricted the ways in which others could use Plaintiffs' photos, including prohibiting their commercial use and requiring attribution. *See* Ex. 1 at 75:17-76:19; Ex. 6; Ex. 7.

Notwithstanding BIPA's provisions, at no time did Defendant provide written notice to Vance or Janecyk of its intent to obtain their Biometric Data from their Flickr photos, nor did it obtain their written consent to do so. *See* Ex. 8 (Def. Interrog. Ans.) at No. 3 (setting forth reasons Defendant did not comply with BIPA), No. 4 (attempting to explain why Defendant was not required to provide notice or obtain consent); Ex. 1 at 92:20-94:10, 190:3-12, 201:14-202:18; Ex. 4 at Nos. 1-2; Ex. 2 at 121:8-14, 125:21-126:2, 135:15-21; Ex. 5 at Nos. 1-2.

## III. Amazon Rekognition.

Amazon's Rekognition is a publicly-available facial recognition product. *See* Ex. 9 (ACLU Report) at 2; *Amazon Rekognition FAQs*.[2] Rekognition competes with other commercial facial recognition offerings. *See* Ex. 10 (Sephus Article) at 10-11. In 2019, when negative reports were published regarding Rekognition's performance (*see, supra,* §IV), Amazon sought to improve the public's perception by improving the product. *See* Ex. 11 (Sephus Dep. Tr.) at 61:14-65:23, 214:12-215:6.

## IV. Criticism of Bias in Facial Recognition Software, Including Rekognition.

In 2018, researchers released *Gender Shades: Intersectional Accuracy Disparities in Commercial Gender Classification* ("*Gender Shades*") in which they analyzed commercial facial recognition products of three companies, including Microsoft and IBM, and highlighted the high error rates each product had with respect to correctly classifying the gender of females and darker-skinned individuals. Ex. 12 (*Gender Shades*) at 1, 8-11.

---

[2] Available at https://aws.amazon.com/rekognition/faqs/?nc=sn&loc=7 (last accessed on June 30, 2022).

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 3

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

In July 2018, the American Civil Liberties Union ("ACLU") published a report showing that Rekognition falsely matched photos of 28 members of Congress with mugshots of other individuals (the "ACLU Report"). Ex. 9 at 1-2. The report revealed the highest error rate amongst people of color. *Id.* at 2.

In January 2019, a *Gender Shades* follow-up study was published (the "*Actionable Auditing*" study) that tracked improvements in the products analyzed in *Gender Shades* versus products not analyzed in that study, including Amazon's Rekognition. *See* Ex. 13 (*Actionable Auditing*) at 1, 4. The *Actionable Auditing* study revealed that Amazon's software had the highest gender classification error rates of all analyzed products, failing to accurately classify dark-skinned females 31.37% of the time. *See id.* at 4; Ex. 11 at 105:23-110:10.

## V.   The Diversity in Faces Dataset.

In or around 2014, Flickr – through its parent company Yahoo! – released a dataset (the "Flickr Dataset") consisting of URL links to approximately 100 million Flickr photos. Ex. 16 (Merler Dep.) at 15:6-17, 23:3-36:13; Ex. 3 at 73:13-74:2, 74:21-75:13, 76:4-15, 76:21-77:5, 77:9-78:12, 80:17-82:11, 83:25-84:22, 87:15-89:3; Ex. 14 (Flickr Dataset ReadMe File) at 1-2.

In early 2019, in the wake of *Gender Shades* and *Actionable Auditing*, IBM released the Diversity in Faces ("DiF") Dataset. *See* Ex. 15 (*Diversity in Faces*). According to IBM, the DiF Dataset would "accelerate efforts towards creating more fair and accurate face recognition systems." *Id.* at 1; *see also* Ex. 16 at 69:7-24. IBM created the DiF Dataset by culling numerous facial images from the Flickr Dataset and processing them to collect, capture and obtain Biometric Data and other information.  *See* Ex. 15 at 7-16. The DiF Dataset links to photos uploaded by Plaintiffs in Illinois that contain their respective face image. *See, supra,* §I.

The DiF Dataset was a large .csv file, with each line of the document corresponding to a face.[3] *See* Ex. 17 (DiF ReadMe File) at CM/ECF 2. ██████████████████████

---

[3] Due to its size, the DiF Dataset is not conducive to being printed as an exhibit. At the Court's request, Plaintiffs can provide the Court with an electronic copy of the DiF Dataset that Plaintiffs have obtained in discovery.

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 4

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

1

2

3

████████. *See id.* at CM/ECF 2-4; Ex. 16 at 76:9-79:9, 80:22-81:24; Dkt. 53 (DiF Slide Deck) at

CM/ECF 6-7, 10-16, 44. To obtain the sixty-eight dlib points, IBM created a graph on each face

and determined the X-Y coordinates of those points. *See* Ex. 16 at 111:7-113:9.

**VI.   Defendant Obtained the DiF Dataset to Improve Rekognition.**

    **A.    Defendant's Rekognition Team.**

Various individuals at Amazon were part of the "faces technology team at

Rekognition." (the "Rekognition Team"). *See* Ex. 11 at 5:20-6:1, 7:17-19, 22:2-7. The

Rekognition Team "was responsible for implementing and developing and researching the

faces AI technology within the Rekognition service or product." *Id.* at 21:20-24. The

Rekognition Team was a subgroup of what was known as the Amazon Web Services[4] AI

science team, which consisted of about fifty individuals. *Id.* at 19:3-13, 22:8-17; Ex. 18 (Xiong

Dep.) at 120:1-4. Members of the Rekognition Team included Nashlie Sephus, Yuanjun Xiong

and Wei Xia. Ex. 11 at 5:20-6:1, 7:17-19, 21:15-19, 22:2-7, 25:23-26:3. Stefano Soatto

managed the science team. Ex. 19 at 17:20-23. Prior to joining the Rekognition Team, Sephus

was on the science team. Ex. 11 at 66:5-12.

    **B.    Defendant's Prioritization of Rekognition's Facial Recognition Capabilities.**

At relevant times, Sephus' high priority was to audit and test the face technologies

within Rekognition for bias in gender classification. Ex. 11 at 68:22-70:1, 70:8-14, 71:16-25,

72:5-11. This was due to the publication of *Gender Shades* and the ACLU Report. *Id.* at 70:2-

7, 100:2-23, 102:18-103:13.

Sephus worked with the then-current version of Rekognition, as well as new versions

that were being trained. *Id.* at 70:15-23. The goal of the testing was to improve Rekognition's

---

[4] In this brief, Amazon and Amazon Web Services are used interchangeably.

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

gender classification accuracy by reducing the error rate: "that's the point of testing, to figure out where we fail so we can improve." *Id.* at 72:12-73:3; *see also id.* at 110:19-111:5 ("it's our . . . charter to continue improving [Rekognition]"). According to Sephus, after she performed her analysis, she reported the results to the Rekognition "product leads," including the product manager over Rekognition. *Id.* at 73:15-75:9. Based on Sephus' work, the Rekognition Team successfully implemented improvements to the product. *Id.* at 76:13-77:3, 86:13-87:22; Ex. 20 (Sephus Profile) at 2.

C.     The Rekognition Team's Obtainment of the DiF Dataset.

In late January 2019, near the time of *Actionable Auditing*'s critique of Rekognition, Soatto and Dr. Tal Hassner, another member of the Rekognition Team, discussed obtaining a copy of the DiF Dataset. Ex. 21 (Hassner Dep.) at 6:12-15, 29:22-30:1, 125:5-126:3, 144:10-16; Ex. 13. Amazon had hired Hassner to see if he could improve the accuracy of its Rekognition facial recognition service. Ex. 21 at 74:8-19.

On February 1, 2019, Hassner sent IBM an email stating he worked for Amazon and sought access to the DiF Dataset for "research and for internal tests." Ex. 22 (Hassner-IBM email chain) at 1-2; Ex. 21 at 129:24-131:18. According to Hassner, in writing the email, he "wasn't trying to be accurate on purpose." Ex. 21 at 134:5-17. Rather he "was trying to be vague . . . . *Id.* Hassner conceded it was possible Amazon wanted to acquire the DiF Dataset to run internal tests on Rekognition's face recognition services. *Id.* at 137:25-138:4.

After IBM informed Hassner that the DiF Dataset was intended for research purposes (Ex. 22 at 1), on February 5, 2019, Hassner sent IBM a completed "DiF Questionnaire" to formally seek access to the DiF Dataset. Exs. 23-24 (Cover Email and Questionnaire); Ex. 21 at 139:18-141:10. In the questionnaire, Hassner omitted any reference to Amazon seeking the dataset for internal tests. *See* Ex. 24 at 2. While Defendant contends the questionnaire required Amazon to agree to IBM's "Terms of Use" (Mot. at CM/ECF 10), the submitted questionnaire shows that Hassner did not check the box agreeing to that provision. Ex. 24 at 3.

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 6

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

On February 16, 2019, IBM approved Hassner's request and sent him a link to download the DiF Dataset. Ex. 25 (2/5-20, 2019 email chain) at 2; Ex. 21 at 159:6-7, 160:1-18. On February 20, 2019, Soatto instructed Hassner to save the DiF Dataset "somewhere where we can all look at it," and Xiong and Pietro Perona – another member of the Rekognition Team – separately downloaded it. Ex. 25 at 1; Ex. 21 at 22:1-16, 145:16-146:11; Ex. 18 at 67:3-11. ████████████████████████████████████████████ Ex. 26 (4/8/2019 email chain) at 3. ████████████████████████████████ ████████████████████████████████████████████ *Id.* at 1; Ex. 18 at 250:25-251:9, 252:1-253:5, 257:3-14.

Hassner believed Perona downloaded his copy of the DiF Dataset to the cloud. Ex. 21 at 165:4-166:9. Defendant has presented no evidence showing the location of the cloud server to which Perona downloaded the DiF Dataset.

While Xiong has contended he downloaded the dataset to an Amazon data center in Oregon (Ex. 18 at 109:2-110:23, 263:3-264:8), his deposition testimony revealed that he had no personal knowledge of the actual location where the DiF Dataset was stored or backed up and merely based his contention on information he saw on a "Web interface." *See id.* at 111:8-112:25, 114:7-114:20, 115:3-116:4, 116:16-23, 118:16-121:14, 125:22-127:24. The same is true of Xia. Ex. 27 (Xia Dep. Tr.) at 26:20-28:13, 50:6-51:21, 52:14-24, 120:14-23, 121:22-122:15, 124:18-20.

**D.    The Rekognition Team's Use of the DiF Dataset to Improve Rekognition.**

Defendant obtained the DiF Dataset to study fairness and bias in Rekognition in order to determine whether the Rekognition models being tested had limitations in those areas. Ex. 18 at 72:24-73:10. The Rekognition Team knew of the negative publicity regarding Rekognition's lack of accuracy at the time it ran the tests. *See id.* at 73:16-74:1.

After obtaining the DiF Dataset, the Rekognition Team: ████████████████████ ████████████████████████████████████████████████████████

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 7

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

1 ██████████████████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████████

4 ████████████████████████████. *Id.* at 67:3-72:3, 179:23-185:1, 198:10-12, 200:6-15, 202:1-

5 19, 206:18-21, 207:1-23, 210:16-213:22, 243:3-245:17, 295:15-299:19; Ex. 11 at 39:12-40:23;

6 93:5-16, 165:10-166:20, 170:1-172:2 177:5-19; Ex. 28 (2/5-3/4, 2019 email chain) at 1; Ex. 29

7 (Feb. 5-25, 2019 email chain) at 1-2; Ex. 30 (4/5/2019 email chain); Ex. 31 (6/3/2019 chat);

8 Ex. 32 (chat communications); Ex. 33 (6/3-5, 2019 email chain) at 3; Ex. 34 (3/4/2019 email

9 chain). According to Xiong, ████████████████████████████████████████

10 ████████████ Ex. 18 at 179:23-186:25.

11      Significantly, Xiong's deposition testimony revealed that ████████████████

12 ██████████████████████████████████████████████████████████

13 ███████████████████████████████████████ *See* Dkt 65 (Xiong

14 Decl.) ¶ 8; Ex. 18 at 203:2-7. ████████████████████████████

15 ██████████████████████████████████████████████████████

16 ██████████████████████████████████████████████████████████

17 ██████████████████████████████████████████████

18 ████████████████████ Ex. 18 at 203:2-7 (emphasis added); *see also id.* at 172:8-18 (testifying

19 that just because the DiF Dataset was not useful to the Rekognition Team does not mean that it

20 was not useful to others at Amazon).

21      Further, Xiong's deposition testimony made clear that he could not reconcile his

22 Declaration testimony regarding the purportedly quick determination that the DiF Dataset was

23 unsuitable for the Reckognition Team's purposes with the continued use of Versions 1A and

24 1B of the dataset. *Id.* at 257:3-261:3; Dkt. 65 ¶¶ 7-9. For instance, Xiong initially testified that

25 the decision regarding the unsuitability of the DiF Dataset was made *before* he provided

26 Michele Donini, a colleague, with access to the dataset in late March 2019. *See* Ex. 18 at

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 8

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

170:11-171:1. However, as he was further questioned regarding ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████ *See id.* at 220:15-222:1, 235:21-236:2, 246:2-248:24, 257:3-259:10. At various

points, Xiong even claimed that he could no longer speak on behalf of himself: "Actually, I

don't speak for myself at the time." *Id.* at 259:16-260:9; *see also* 201:15-17 ("I cannot . . .

speak for myself three years ago."), 221:20-222:1 (same), 223:1-2 (same).

    Notably, ███████████████████████████████████████

*See id.* at 243:3-244:1; Ex. 30 at 1-2. ███████████████████████████

█████████████████████████████████ Ex. 18 at 243:16-21; Ex. 30 at 1-2.

██████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████ Ex. 30 at 2; Ex. 18 at 246:2-19. ███████████████

████████████████████████████████████████████████████████████

████████ Ex. 11 at 150:17-156:19.

    According to Sephus, who worked on the project, she spent a few days working with

the DiF Dataset and, in June 2019 – well after Xiong claims the Rekognition Team determined

the dataset to be unsuitable – determined it could not be used. Ex. 11 at 97:19-98:2, 130:11-16;

Ex. 18 at 170:11-171:1.

██████████████████████████████████████████████████████████

*See* Ex. 35 (Face Data Summary). █████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████ *See* Ex. 18 at 211:23-212:13 ███████████

████████████████████████████████████████████████████

████████████████████████████████████ Ex. 35 at 1-2. ███████

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

██████████████████████████████████████████████████████

███████████████████████████ *See* Ex. 35 at 1; Ex. 18 at 170:11-171:1

## ARGUMENT

### I.   Legal Standard

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Sierra Medical Services Alliance v. Kent*, 883 F.3d 1216, 1222 (9th Cir. 2018) (quoting *Anderson*, 477 U.S. at 248). "In making that determination, a court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). "In determining whether summary judgment is appropriate, we view the facts in the light most favorable to the non-moving party and draw reasonable inferences in favor of that party." *Scheuring v. Traylor Bros., Inc.*, 476 F.3d 781, 784 (9th Cir. 2007) (citing *Anderson*, 477 U.S. at 255)).

### II.   Neither the Extraterritoriality Doctrine nor the Dormant Commerce Clause Bar Plaintiffs' Claims.

Rehashing its failed arguments, Defendant contends that Plaintiffs' claims fail because BIPA "does not apply to Amazon's out-of-state conduct," and if it did, this would violate the dormant Commerce clause. Mot. at CM/ECF 17; *see also* Dkt. 18 at CM/ECF 13-22; Dkt. 34 at 6-12. The factual record does not alter the validity of the Court's prior analysis.

#### A.   BIPA, as Applied, Does Not Violate Illinois' Extraterritoriality Doctrine.

##### 1.   The Factual Record Underscores the Propriety of the Court's Prior Ruling.

At the motion to dismiss stage, the Court found that the extraterritoriality doctrine did not bar Plaintiffs' claims because their allegations showed that Defendant's wrongful conduct occurred primarily and substantially in Illinois:

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 10

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

Plaintiffs, and all purported class members, are Illinois residents who, while in Illinois, uploaded photos that were taken in Illinois. The required disclosures or permissions would have been obtained from Illinois, and so any communication would have necessarily involved Illinois. The alleged harm to privacy interests is ongoing for Illinois residents. Moreover, Plaintiffs allege that Amazon sells various facial recognition products nationwide, that these products are used by consumers and law enforcement agencies with national reach, and that the Diversity in Faces dataset 'improve[d] its facial recognition products', thereby allowing the reasonable inference that Amazon utilized the dataset in Illinois during its business dealings.

Dkt. 34 at 8.  The allegations quoted above, found sufficient by the Court to preclude dismissal at the pleadings stage, are similarly supported by the summary judgment record, when viewed in the light most favorable to Plaintiffs.

Plaintiffs are Illinois residents who, "while in Illinois," uploaded photos taken in Illinois. *See* SOF[5] §II. Had Defendant made any effort to comply with BIPA, the communications would have involved Illinois. *See, infra,* §II.A.2. Thus, Defendant's unlawful conduct occurred in Illinois.

Moreover, contrary to Defendant's contention, whether Defendant improved Rekognition based on the DiF Dataset is a disputed question of fact. The record is clear that ████████ ████████████████████████████████████████████████████████████ ████████████████████████ *See* SOF §VI. While Defendant contends it quickly found the DiF Dataset to be unsuitable (Mot. at CM/ECF 13-16), the factual record shows ██████████ ████████████████████████████████████████████████████████████ ████████  *See* SOF §VI. Viewed in the proper light, the facts and inferences reveal that Defendant used the DiF Dataset to improve Rekognition.

The Court has also previously found that the geographic location "where Amazon obtained the dataset . . . may not be dispositive." Dkt. 34 at 8. Since the Court denied Defendant's motion to dismiss, they only thing that has changed is that Defendant prematurely moved for summary judgment, and the developed facts show that the relevant conduct occurred primarily and substantially in Illinois.

---

[5] "SOF" refers to Plaintiffs' Statement of Facts Precluding Summary Judgment.

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 11

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

### 2. Plaintiffs' Claims Do Not Require Any Extraterritorial Application of BIPA.

Absent the Court's prior ruling, it still should reject Defendant's extraterritoriality argument. In *Avery v. State Farm Mut. Auto. Ins. Co.,* 835 N.E.2d 801, 854 (Ill. 2005), the Illinois Supreme Court thoroughly discussed applicable extraterritoriality principles when determining an Illinois statute's proper reach. While "[t]here is no single formula or bright-line test for determining whether a transaction occurs within this state[,]" the court determined that some of the relevant circumstances in determining whether alleged fraudulent consumer transactions occurred "primarily and substantially" within Illinois were: (a) where the plaintiffs resided; (b) where the deception or "failure to disclose" occurred; and (c) where the plaintiffs incurred their injury. 835 N.E.2d at 854.

Applying the *Avery* factors here, Defendant's summary judgment motion fails. It is undisputed that Plaintiffs resided in Illinois at relevant times. *See* SOF §II. This is not a case where the plaintiffs "are non-residents suing under Illinois law, which is the paradigmatic situation for the presumption against the extraterritorial application of local law." *In re Facebook Biometric Info. Privacy Litig.* ("*In re Facebook*"), 326 F.R.D. 535, 547 (N.D. Cal. 2018) (citing *Avery,* 835 N.E.2d 801).

Further, photos from which Plaintiffs' Biometric Data was collected, captured and obtained were taken in Illinois and uploaded to the internet in Illinois. *See* SOF §II. Similarly, had Defendant complied with BIPA's requirements, the required notifications and consents would have occurred in Illinois. *See Rivera v. Google, Inc.*, 238 F.Supp.3d 1088, 1102 (N.D. Ill. 2017) ("lack of consent" occurs where the victim is located); *cf. Avery,* 835 N.E.2d at 854 (finding claims of non-Illinois resident barred by extraterritoriality doctrine because "[t]he alleged deception in this case – the failure to disclose" certain facts about automobile parts, occurred in Louisiana, not Illinois).

Finally, Plaintiffs' injuries occurred in Illinois. The Seventh Circuit has likened a defendant's collection of a victim's Biometric Data without providing notice and obtaining

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 12

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

"informed consent" to an invasion of the victim's "private domain, much like an act of trespass would be . . . ." *See Bryant v. Compass Grp USA, Inc.*, 958 F.3d 617, 624 (7th Cir. 2020). That "invasion" or "trespass" occurs in Illinois, the location of the victim's "private domain." *See id.*

The strong consensus of courts have rejected claims that BIPA violates the extraterritoriality doctrine where Illinois residents have brought claims relating to photos taken and uploaded to the internet in Illinois – regardless of the geographic location of the: (a) entity that ultimately came into possession of the Biometric Data; or (b) servers storing the data. *See, e.g.*, *In re Facebook*, 326 F.R.D. 535, 547 (N.D. Cal. 2018) (case "deeply rooted in Illinois" where plaintiffs were located in Illinois and claims were based on the application of Illinois law to use of a social media site in Illinois); *In re Clearview AI, Inc., Consumer Priv. Litig.*, 2022 WL 444135, at *4 (N.D. Ill. Feb. 14, 2022) (fact pattern of Illinois residents being deprived of BIPA-compliant notices in Illinois, resulting in privacy violations in Illinois, did not require BIPA's extraterritorial application, despite storage of data in New York); *Rivera*, 238 F.Supp.3d at 1101-02 (plaintiffs' Illinois residency and Illinois upload of photographs taken in Illinois, and defendant's failure to take required actions in Illinois, suggest that alleged violations "primarily happened in Illinois," regardless of face scan location); *cf. Monroy v. Shutterfly, Inc.*, 2017 WL 4099846, at *6 (N.D. Ill. Sept. 15, 2017) (no extraterritoriality violation where non-Illinois resident's photo was uploaded in Illinois by Illinois citizen and required notice/consent would have occurred in Illinois).

The extraterritoriality defense falls particularly flat here. "BIPA's express concerns about data collection by '[m]ajor national corporations,' should appropriately color the Court's analysis of the issue. *See In re Facebook*, 326 F.R.D. at 547 (noting that extraterritoriality inquiry looks to the "objects of the statute's solicitude").

Defendant's argument hinges almost entirely on the geographic location of its employees at the time they downloaded, accessed, and analyzed the Biometric Data in DiF

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 13

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

Dataset. Mot. at CM/ECF 18-20. Those isolated facts are from dispositive. In analyzing a similar BIPA claim, the Ninth Circuit held that "it is reasonable to infer that the General Assembly contemplated BIPA's application to individuals who are located in Illinois, even if some relevant activities occur outside the state." *Patel v. Facebook, Inc.*, 932 F.3d 1264, 1276 (9th Cir. 2019). The lower court in the same case highlighted the grave consequences that would occur from a different conclusion:

> Making the geographic coordinates of a server the most important circumstance in fixing the location of an Internet company's conduct would yield the questionable results *Avery* counsels against. Among other problematic outcomes, it would effectively gut the ability of states without server sites to apply their consumer protection laws to residents for online activity that occurred substantially within their borders.

*In re Facebook*, 326 F.R.D. at 548.

Defendant's reliance on *McGoveran v. Amazon Web Servs., Inc.*, 2021 WL 4502089, at *1 (D. Del. Sept. 30, 2021) (Mot. at CM/ECF 20-22), does not change this conclusion. *McGoveran* is an outlier case from the District of Delaware. This Court need not and should not follow *McGoveran*, in light of its own prior ruling and the clear weight of authority.

Even if the Court found *McGoveran* persuasive, it is distinguishable. In *McGoveran*, the Amazon's alleged role in the claimed BIPA violation was simply that biometric data was stored on its servers and scanned by one of its customers using Amazon's cloud-based call center services. *McGoveran*, 2021 WL 4502089, at *1. Unlike *McGoveran*, here, Defendant actively obtained and used Plaintiffs' Biometric Data for its own benefit.

While the court in *McGoveran* refused to consider the location where the Defendant was required to provide notice and obtain consent, that aspect of the decision is unpersuasive. As a threshold matter, and as discussed above, the Illinois Supreme Court has expressly held that the location of an allegedly unlawful *failure to communicate* with a consumer is an important part of the extraterritoriality analysis. *See Avery*, 835 N.E.2d at 854. Further, as discussed above, various other federal courts have reached a different conclusion than the court in *McGoveran*. Moreover, it would be absurd to permit "major national corporations"

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 14

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

like Amazon, expressly the target of BIPA's intended reach, *see* 740 Ill. Comp. Stat. 14/5(b), to evade BIPA's carefully-crafted privacy protections for Illinois residents, simply by avoiding contact with the very citizens the statute seeks to protect.

### B.    The Dormant Commerce Clause Does Not Bar Plaintiffs' claims.

While the dormant Commerce Clause limits states' powers, "[n]ot every exercise of state power with some impact on interstate commerce . . . violates the Commerce Clause." *Gravquick A/S v. Trimble Navig. Int'l Ltd.*, 323 F.3d 1219, 1224 (9th Cir. 2003). The Supreme Court has developed a two-pronged test to determine whether a state economic regulation violates the Commerce Clause. *See Chinatown Neighborhood Ass'n v. Harris* ("*Chinatown*"), 794 F.3d 1136, 1145 (9th Cir. 2015). If a state statute discriminates against or directly regulates interstate commerce, a court should strike down the statute (or challenged application thereof) without additional inquiry. *Id.* However, where a statute only has an indirect effect on interstate commerce, no dormant Commerce Clause violation exists unless the statute's burdens outweigh its putative benefits, making it irrational or unreasonable. *Id.*

A statute "directly regulates" interstate commerce and violates the Commerce Clause where it directly controls commerce taking place *wholly* outside a state's boundaries. *Rocky Mountain Farmers Union v. Corey,* 730 F.3d 1070, 1101 (2013). But if a statute regulates a transaction or relationship "in which at least one party is located in [the regulating state]," as does BIPA, the statute does not regulate extraterritorial conduct for purposes of the "direct regulation" test. *Chinatown*, 794 F.3d at 1146.

States have broad power to enact laws that protect their residents in matters of local concern. *Nat'l Ass'n of Optometrists and Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012). A state "may regulate with reference to local harms" even if the regulation impacts out-of-state entities whose conduct has in-state ramifications. *Corey*, 730 F.3d at 1104. Furthermore, the dormant Commerce Clause does not demand uniformity in state laws. *Corey*, 730 F.3d at 1104. As the Ninth Circuit has held, "if we were to invalidate a regulation every

time another state considered a complementary statute, we would destroy the states' ability to experiment with regulation." *Id.* at 1105.

As a threshold matter, BIPA does not directly regulate interstate commerce or violate the Commerce Clause. BIPA's legislative history makes clear that, far from being directed to commerce *wholly* outside of Illinois, the law was enacted to address the Illinois General Assembly's concern with out-of-state entities reaching *into* Illinois to engage in novel uses of biometric technology – uses which, without appropriate safeguards, risked compromising the sensitive private data of Illinois residents. *See* 740 Ill. Comp. Stat. 14/5(b), (c), (g) (noting that "[m]ajor national corporations" are using Illinois communities "as pilot testing sites for new applications of biometric-facilitated" transactions; finding that biometrics are uniquely sensitive which, "once compromised," leave an individual with "no recourse;" and enacting provisions to regulate and safeguard the collection, use, and handling of biometric identifiers and information).

In this case, BIPA's application to Defendant's conduct in obtaining and using Plaintiffs' Biometric Data for its own pecuniary benefit, does not violate the 'direct regulation' prong of the dormant Commerce Clause test. BIPA does not control commerce wholly outside of Illinois. And given the practical realities of commerce in the digital age, the Supreme Court has held that it is inappropriate to "limit[] the lawful prerogatives of the States" by requiring that regulated entities have a physical presence in the state. *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2097 (2018).

Defendant makes no argument that is addressed towards the second prong of the dormant Commerce Clause test, which requires a showing that the statute's burdens outweigh its putative benefits, thereby making the statute irrational or unreasonable. *Chinatown,* 794 F.3d at 1145. The point is therefore waived. *Fox v. Holland Am. Line, Inc.*, 2016 WL 258522, at *3 (W.D. Wash. Jan. 21, 2016). And wisely so, since at the summary judgment stage, with all evidence construed in Plaintiffs' favor, the putative benefits of protecting Illinois residents'

Plaintiffs' Brief in Opposition to
Defendant's Renewed Motion for Summary Judgment - 16

Loevy & Loevy
100 S. King Street., #100-748
Seattle, Washington 98104
T: 312-243-5900, FAX: 312-243-5902

immutable Biometric Data would outweigh any purported burden resulting from Defendant's compliance with the statute. *See Ades v. Omni Hotels Mgm't Corp.*, 46 F.Supp.3d 999, 1015-16 (C.D. Cal. 2014) (no dormant Commerce Clause violation where non-California call center had to identify California calls).

Instead of addressing the second prong of the legal test, Defendant contends BIPA's application is unlawful because it would "conflict with" the policy decisions of Washington and Georgia in enacting different (or non-existent) state statutory schemes regarding biometric data. Mot. at CM/ECF 24-26. Not so. There is no conflict.

The existence of two state statutes that regulate biometric data does not offend the dormant Commerce Clause. *See Corey,* 730 F.3d at 1105. As the Ninth Circuit has recognized, "[s]uccessful [state regulatory] experiments inspire imitation both vertically . . . and horizontally . . . ." *Id.* at 1105. Thus, "[i]f we [the Ninth Circuit] were to invalidate [a] regulation every time another state considered a complementary statute, we would destroy the states' ability to experiment with regulation." *Id.*

Notably, Defendant does not allege that compliance with its obligations under BIPA would compel it to violate its state law obligations in Washington or Georgia. It simply points out that BIPA imposes more stringent requirements than these other states (but which are alleged to apply in this case only with reference to Illinois residents). Mot. at CM/ECF 23-26.

In actuality, Illinois' and Washington's biometric laws are complementary—*i.e.*, they both seek to shape the confines of the appropriate use of Biometric Data. *See* 740 Ill. Comp. Stat. 14/1, *et seq.*; RCW 19.375.010, *et seq.* These states' experimentation with regulation does not require that either state's statute be invalidated; nor does it allow Washington to render BIPA meaningless vis-à-vis Washington private entities' relationships with Illinois residents. Such experimentation is encouraged. At the same time Defendant complains of BIPA's reach, it seeks to impermissibly project Washington's regulatory scheme onto Illinois and negate BIPA's privacy protections. *Cf. In re Facebook*, 185 F.Supp.3d 1155, 1169-70 (N.D. Cal.

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 17

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

2016) (rejecting California choice of law provision that would negate BIPA's protections). Taken to the extreme, if Washington were to pass a law exempting all businesses from liability arising from the collection of Biometric Data, according to Defendant, Illinois could not exercise its legitimate interest in protecting its residents' privacy vis-à-vis Washington businesses.

Notably, the two cases Defendant cites in support of its argument (Mot. at CM/ECF 25) have nothing to do with the balancing required under the second prong of the dormant Commerce Clause test. In *Nat'l Collegiate Athletic Ass'n v. Miller*, 10 F.3d 633, 639 (9th Cir. 1993), the Ninth Circuit rejected a state statute imposing minimal procedural requirements for enforcement proceedings in collegial athletics on the basis that "the serious risk of inconsistent obligations wrought by the extraterritorial effect of the Statute demonstrates why it constitutes a per se violation of the Commerce Clause." *Id.* The concerns regarding the national collegiate organization at issue in *Miller* do not exist here, and this case offers no support for the idea that BIPA's application fails the balancing test at the second step. *Miller* is also inapposite because Plaintiffs do not seek to give BIPA extraterritorial effect. As for *Mazza v. Am. Honda Co., Inc.*, 666 F.3d 581, 592 (9th Cir. 2012), there, the Ninth Circuit tackled a conflict of laws issue at class certification in a proposed nationwide class action where only one-fifth of the class members resided in the state whose legal framework was invoked as the basis for the claims, *id.*—a non-issue in this case since Plaintiffs and the entire class are Illinois residents.

## III.   BIPA § 15(b) Applies to Defendant's Download, Storage, and Use of the DiF Dataset.

Amazon argues further that, regardless of what the text of BIPA states, holding it to the obligation of complying with BIPA would lead to absurd results, such that the statute cannot possibly be held to apply to them. Mot. at 26-28. This argument is barred by law of the case, lacks legal basis and is not supported by the factual record.

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

**A.      Law of the Case Bars This Argument.**

In reiterating the same argument made in its motion to dismiss (Dkt. 18 at CM/ECF 25-27), Defendant again urges the Court to read imaginary limitations into BIPA that would allow entities to disregard it and to obtain Biometric Data from Illinois residents so long as those entities have no pre-existing relationship with the Illinois residents whose Biometric Data they acquired. Mot. at CM/ECF 26-28. In support, Amazon relies solely on the misguided notion that it would be "not just 'difficult' but impossible, to the point where application of Section 15(b) would be an absurdity," to require it to comply with BIPA. *Id.* at CM/ECF 27.

In the Ninth Circuit, the "law of the case" doctrine generally precludes a court from "reconsidering an issue that has already been decided by the same court[,]" unless the prior decision was "clearly erroneous," there has been an intervening change in the law or other changed circumstances or a manifest injustice would otherwise result. *U.S. v. Alexander*, 106 F.3d 874, 876 (9th Cir. 1997) (reversing district court for departing from law of the case); *G.G. v. Valve Corp.*, No. 2020 WL 7385710, at *6-7 (W.D. Wash. Dec. 16, 2020) Failure to apply the doctrine of law of the case absent the requisite conditions constitutes an abuse of discretion. *Alexander*, 106 F.3d at 876.

This Court should reject Defendant's invitation to violate law of the case doctrine by changing its prior ruling on the same argument in the same case. As this Court ruled:

> Nor will the court adopt Amazon's proposal that § 15(b) only applies when an entity acquires biometric data "directly from any individual." Nothing in the statute's language supports such a narrow application . . . . Section 15(b) does not add any limitation [], stating only that the protections are triggered when an entity collects biometric data, regardless of how that collection occurs. . . . In essence, Amazon wishes the court to read the limitation "directly from the person" into § 15(b) where none exists. The court cannot do so . . . .

> This straightforward reading of the text does not, as Amazon fears, produce an absurd result. BIPA obligates any private entity that obtains a person's biometric identifier to comply with certain requirements to protect that person's privacy interests. See 740 ILCS 14/5 (recognizing public's wariness of use of biometrics and need for regulation for public welfare, security and safety). Whether that biometric information comes from an individual or is part of a large dataset, there is nothing absurd about requiring any entity that obtains such

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

information to comply with the safeguards that the Illinois legislature deemed
necessary.

Dkt. 34 at 17-18 (internal citations omitted). At bottom, this Court concluded that Section

"15(b) applies when a private entity collects, captures, trades for, *or gets biometric data in*

*some other way*," even if the private entity does not have a preexisting relationship with the

subjects it captured the biometric data from. *Id.* at 16-18. Nothing has changed since the Court

first rejected Defendant's contention, and Defendant offers no basis to revisit this ruling.[6]

> ### B.   Defendant's Proposed Limitation Lacks Any Persuasive Legal Basis.

As the Court previously found, Defendant's proposed limitation on § 15(b) has no basis

in BIPA's statutory text. Dkt. 34 at 17. Unsurprisingly, then, the overwhelming weight of

authority has rejected Defendant's position and declined to limit § 15(b) to situations only

where Biometric Data passed directly from plaintiff to defendant, without intermediary. *See,*

*e.g.*, *Vance v. Microsoft Corp.* ("*Microsoft*"), 525 F.Supp.3d 1287, 1298 (W.D. Wash. 2021);

*Flores v. Motorola Solutions, Inc.*, 2021 WL 232627, at *3 (N.D. Ill. Jan. 8, 2021); *Monroy v.*

*Shutterfly, Inc.*, 2017 WL 4099846, at *1 (N.D. Ill. Sep. 15, 2017); *Ronquillo v. Doctor's*

*Associates, LLC*, 2022 WL 1016600, at *3 (N.D. Ill. Apr. 4, 2022); *Figueroa v. Kronos, Inc.*,

454 F.Supp.3d 772, 783-84 (N.D. Ill. 2020); *Neals v. PAR Tech. Corp.*, 419 F.Supp.3d 1088,

1092 (N.D. Ill. 2019).

In arguing to the contrary, Defendant relies on the misguided notion that it would be

"practically impossible, to the point where application of Section 15(b) would be absurd," and

on the unpublished opinion issued in *Zellmer v. Facebook, Inc.*, 2022 WL 976981, at *3 (N.D.

Cal. 2022). Neither is persuasive.

First, as discussed above, this Court has already found that interpreting BIPA consistent

with its plain language "does not, as Amazon fears, produce an absurd result." Dkt. 34 at 17.

---

[6] Plaintiffs acknowledge that the Ninth Circuit allows district courts in some circumstances to reconsider their
prior orders. *See U.S. v. Smith*, 239 F.3d 944, 949 (9th Cir. 2004). Regardless, this Court should not stray from its
prior findings to maintain consistency and avoid reconsideration of matters once decided during the course of a
single continuing lawsuit, which are the goals this doctrine is meant to further. *See Ingle v. Circuit City*, 408 F.3d
592, 594 (9th Cir. 2005).

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 20

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

The Court also distinguished the authority Defendant previously relied on, finding "[t]he same is not true here. To the extent that dicta in these cases require some relationship to exist, the court declines to adopt that interpretation, as that requirement does not appear in the statutory language, and persuasive authority exists to the contrary." *Id.* at 19.

Defendant (and the court in *Zellmer*) miscites to *Rosenbach v. Six Flags Ent't Corp.*, 129 N.E.3d 1197, 1207 (Ill. 2019) for the proposition that "'[c]ompliance should not be difficult' and any expense a business might incur to comply should be minimal." Mot. at CM/ECF 26. The Illinois Supreme Court made this finding to underscore the critical importance of compliance, not minimize it. The Illinois Supreme Court never indicated that "any expense a business might incur to comply should be minimal." Instead, the court found that "whatever expenses a business might incur to meet the law's requirements are likely to be insignificant *compared to the substantial and irreversible harm that could result if biometric identifiers and information are not properly safeguarded*; and the public welfare, security, and safety will be advanced." *Rosenbach*, 129 N.E.3d at 1207 (emphasis added). Defendant's efforts to comply with BIPA, if it had bothered to make any at all (*e.g.*, obtaining a copy of the DiF Dataset with the Biometric Data omitted), could very well be insignificant compared to the substantial and irreversible harm Defendant jeopardized Illinois residents with.

Nor should this Court follow the rationale in *Zellmer*, which has not been relied on by any court and is an outlier to the extent it permits an entity to escape BIPA liability because it lacked a preexisting relationship with the Illinois resident from whom it collected Biometric Data. In *Zellmer*, the court based its analysis primarily on language in BIPA indicating that "the Illinois legislature clearly contemplated that BIPA would apply in situations where a business had at least some measure of knowing contact with and awareness of the people subject to biometric data collection." *Zellmer*, 2022 WL 976981, at *4; 740 Ill. Comp. Stat. 14/5(a)-(b). Regardless of whether BIPA applies when parties know each other, there is

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 21

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

nothing in the statute suggesting an intent to exclude from BIPA's purview the collection of Biometric Data in the absence of a preexisting relationship.

Indeed, § 5(a)'s reference to financial transactions and security screenings explicitly encompasses the capture of Biometric Data from unknown individuals, including, for example, the use of facial recognition in connection with surveillance video on a street corner or in a mall. This Court and the majority of others to have considered the question have refused to read Defendant's strained limitation into BIPA, which would effectively gut the statute.

## C.     The Record Does Not Support Defendant's Factual Contention.

As the summary judgment movant, Defendant fails at carrying its burden of demonstrating undisputed factual support for its central contention – that "the BIPA 'compliance' Plaintiffs expect of Amazon is not just 'difficult' but impossible." Mot. at CM/ECF 26. This bold factual claim is almost entirely unsupported by any citations to the summary judgment record. Indeed, the only "facts" in this section of its brief for which Defendant provides record citations is the claim that it obtained the DiF Dataset, containing photos from around the world, "without knowing whether *any* of those people were from Illinois." *Id.* Even assuming this were true (which it likely is not, given Defendant's data-sophisticated employees surely would have known at least some residents of the country's sixth-most-populous state would appear in this massive dataset), Defendant provides no factual support for its claim that complying with BIPA would have been impossible. Nor could it. As Plaintiffs contended previously, Defendant could have reached out to IBM *before* requesting the DiF Dataset to confirm whether it contained photos taken in Illinois and/or whether it contained the subjects' Biometric Data. Upon learning that the dataset had Biometric Data, Defendant could have undertaken any of the various methods proposed in Plaintiffs' Motion for Class Certification (Dkt. 51 at CM/ECF 25-28) to provide the necessary notice and obtain the necessary consent. Tellingly, Defendant did not bother to try contacting any individual in the DiF Dataset to obtain their consent, either before or after obtaining the dataset. *See* Ex. 8 at

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

Nos. 3-4; Ex. 1 at 92:20-94:10, 190:3-12, 201:14-202:18; Ex. 4 at Nos. 1-2; Ex. 2 at 121:8-14, 125:21-126:2, 135:15-21; Ex. 6 at Nos. 1-2. Of course, if all else failed, Defendant could have simply opted to *not* access this dataset containing Biometric Data. There is nothing unfair or absurd about requiring "researchers" or other parties to respect Illinois residents' sensitive Biometric Data if they choose to obtain it.

## IV.   The Court Should Not Grant Summary Judgment on Plaintiffs' BIPA § 15(c) Claim.

Defendant argues it is entitled to judgment on Plaintiffs' BIPA § 15(c) claim because "Amazon did not profit from Plaintiffs' biometric identifiers or information." Mot. at CM/ECF 27. This argument rests on an overly narrow interpretation of BIPA's "otherwise profit from" language. *See* 740 Ill. Comp. Stat. 14/15(c). Defendant contends that § 15(c) is only implicated where an entity directly profits from the sale of Biometric Data or from a product that has biometric data embedded in it. Mot. at CM/ECF 28. However, § 15(c) also applies where, as here, an entity uses Biometric Data to improve its product, resulting in increased profits.[7] As Plaintiffs' prior briefs set forth in detail, *see generally* Dkt. 24 at CM/ECF 27-28, Dkt. 36 at CM/ECF 3-7, this interpretation is most harmonious with BIPA's legislative history, 740 Ill. Comp. Stat. 14/5, the plain meaning of the text, and other persuasive authority that has addressed the issue, *see, e.g.*, *Flores,* 2021 WL 232627, at *3. And the factual record supports the contention that Defendant ███████████████████████████████████ ███████████ *See* SOF §VI. Summary judgment on this claim should be denied.

## V.   Factual Disputes Preclude Summary Judgment on Plaintiffs' Unjust Enrichment Claim.

Defendant makes a brief argument asserting its entitlement to summary judgment on Plaintiffs' unjust enrichment claims. Mot. at CM/ECF 29-30. The argument boils down to a single proposition – that "the undisputed evidence demonstrates that . . . Defendant did not use

---

[7] Plaintiffs acknowledge that the Court previously rejected Plaintiffs' interpretation of the "otherwise profit from" language in BIPA § 15(c). *See* Dkt. 38 at 5-12. Plaintiffs set forth their argument to preserve the issue.

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 23

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

or benefit from the DiF Dataset, much less "profit" from it." *Id.* at CM/ECF 30. However, as demonstrated in Plaintiffs' statement of facts, there are numerous disputed facts on this issue, and record support which, construed in Plaintiffs' favor, preclude summary judgment. Contrary to Amazon's assertion, the record demonstrates that ███████████████ ███████████████████████████████████████████ *See* SOF §VI.C-D. Further, not only Defendant ███████████████████████████ ███████████████████ *See* SOF §VI.D. Perhaps most importantly, the very purpose for which Defendant obtained the dataset was to improve Rekognition in the wake of negative publicity regarding it high error rates. *See* SOF §§IV, VI.

## CONCLUSION

Contrary to Defendant's arguments, BIPA, as applied to the facts of this case, does not violate the extraterritoriality doctrine or the dormant Commerce Clause. This Court previously reached that conclusion and should adhere to that decision, since the summary judgment record mirrors the allegations previously found insufficient. Defendant's argument with respect to BIPA § 15(b) also fails. Again, this Court previously rejected Defendant's argument, which finds no support in the statutory text, case law or factual record. Defendant's BIPA § 15(c) argument relies on an improper interpretation of the section's provisions, and thus lacks merit. Finally, disputed questions of fact exist as to Plaintiffs' unjust enrichment claim. For all of these reasons, and those argued throughout, the Court should deny Defendant's renewed motion for summary judgment in its entirety.

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 24

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902

Dated: July 1, 2022

STEVEN VANCE and TIM JANECYK, for themselves and others similarly situated,

By:  /s/ Scott R. Drury
SCOTT R. DRURY, ISBA #6255867
*Attorney for Plaintiffs*

David B. Owens WSBA #52856
LOEVY & LOEVY
100 S. King Street, Suite 100
Seattle, WA 98104
david@loevy.com

Gary Lynch* (PA Bar No. #56887)
CARLSON LYNCH LLP
1133 Penn Avenue, Floor 5
Pittsburgh, PA 15222
(412) 322-9243
glynch@carlsonlynch.com

Michael Kanovitz* (ISBA #6275233)
Scott R. Drury* (ISBA #6255867)
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
312.243.5900
mike@loevy.com
drury@loevy.com

Katrina Carroll* (ISBA #6291405)
Nicholas R. Lange* (ISBA #6318106)
CARLSON LYNCH LLP
111 West Washington Street, Suite 1240
Chicago, Illinois 60602
312.750.1265
kcarroll@carlsonlynch.com
nlange@carlsonlynch.com

*admitted *pro hac vice*

*admitted *pro hac vice*

PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT - 25

LOEVY & LOEVY
100 S. KING STREET., #100-748
SEATTLE, WASHINGTON 98104
T: 312-243-5900, FAX: 312-243-5902