1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

12

13

14

STEVEN VANCE, et al.,

Plaintiffs,

v.

AMAZON.COM, INC.,

Defendant.

CASE NO. C20-1084JLR

ORDER ON AMAZON'S
MOTION FOR SUMMARY
JUDGMENT

**FILED PROVISIONALLY
UNDER SEAL**

15

## I.   INTRODUCTION

16   Before the court is Defendant Amazon.com, Inc.'s ("Amazon") renewed motion

17   for summary judgment.  (Mot. (Dkt. # 111); Reply (Dkt. # 125).)  Plaintiffs Steven Vance

18   and Tim Janecyk (collectively, "Plaintiffs") oppose Amazon's motion.  (Resp. (Dkt.

19   ## 119-1 (sealed), 123 (redacted[1])).)  The court has considered the motion, all materials

20

21

22

[1] Plaintiffs filed a redacted version of their response before the court issued its order on
Plaintiffs' motion to seal.  (*See* Orig. Resp. (Dkt. # 115); Mot. to Seal (Dkt. # 117); 7/22/22
Order (Dkt. # 122) (granting Plaintiffs' motion to seal six of nine documents that Amazon had
designated as confidential and ordering Plaintiffs to file an amended redacted version of their

ORDER - 1

1  submitted in support of and in opposition to the motion, and the governing law.  Being

2  fully advised,[2] the court GRANTS Amazon's motion for summary judgment.

## II.    BACKGROUND

4  The court sets forth the factual and procedural background of this case below.

**A.    Factual Background**

6  <u>1.    The Diversity in Faces ("DIF") Dataset</u>

7  Plaintiffs are longtime Illinois residents who, beginning in 2008, uploaded digital

8  photographs, including photos of themselves, to Flickr, a photo-sharing website.  (*See*

9  Compl. (Dkt. # 1) ¶¶ 6-7, 28, 66-67, 75; Vance Dep.[3] at 9:15-10:9; Janecyk Dep.[4] at

10  39:7-40:1.)  In 2014, Yahoo!, Flickr's then-parent company, publicly released a dataset of

11  about 100 million photographs that had been uploaded to Flickr's website between 2004

12

13  response).)  The court cites the amended redacted response in this order.  Sealed versions of
Plaintiffs' response and exhibits are attached to the declaration of Scott R. Drury filed in support

14  of Plaintiffs' motion to seal.  (Drury Seal Decl. (Dkt. ## 119 (sealed), 118 (public)).)

15  [2] Both parties request oral argument on the motion (*see* Mot. at 1; Resp. at 1).  The court,
however, concludes that oral argument would not be helpful to its disposition of the motion.  *See*

16  Local Rules W.D. Wash. LCR 7(b)(4).

17  [3] Both parties have submitted excerpts from Mr. Vance's deposition.  (*See* Allen Decl.
(Dkt. # 63) ¶ 2, Ex. 1; 7/26/22 Drury Decl. (Dkt. # 124) ¶ 2, Ex. 1.)  For ease of reference, the
court cites directly to the page and line number of the deposition.

18  The court notes that Plaintiffs did not highlight the portions of the deposition transcripts

19  that they referred to in their pleadings as required by Local Civil Rule 10(e)(10).  *See* Local
Rules W.D. Wash. LCR 10(e)(10) ("All exhibits [submitted in support of or in opposition to a

20  motion] must be marked to designate testimony or evidence referred to in the parties' filings.").
The court directs Plaintiffs' counsel to review the local rules regarding marking exhibits before
making any further filings.

21  [4] Both parties have submitted excerpts from Mr. Janecyk's deposition.  (*See* Allen Decl.

22  ¶ 3, Ex. 2; 7/26/22 Drury Decl. ¶ 3, Ex. 2.)  For ease of reference, the court cites directly to the
page and line number of the deposition.

1    and 2014 (the "YFCC-100M Dataset").  (*See* Merler Decl. (Dkt. # 70) ¶ 3, Ex. A

2    ("*Diversity in Faces*") at 2.)  The YFCC-100M Dataset included photos uploaded by both

3    Plaintiffs.  (*See* Vance Dep. at 179:22-23; Janecyk Dep. at 95:22-24.)

4            Before 2018, "there was an industry-wide problem with many facial recognition

5    systems' ability to accurately characterize individuals who were not male and did not

6    have light colored skin tones." (Merler Decl. ¶ 4.)  As a result, "the facial recognition

7    systems and algorithms associated with those facial recognition systems were trained in

8    such a way that the systems were able to accurately characterize a white, light skinned

9    male subject, but the technology suffered from inaccuracies when it had to characterize a

10   non-male or a person with darker skin tones." (*Id.*)  Seeking to "advance the study of

11   fairness and accuracy in face recognition technology," researchers working for

12   International Business Machines Corporation ("IBM")[5] used one million of the photos in

13   the YFCC-100M Dataset to develop the Diversity in Faces ("DiF") Dataset at issue in

14   this case.  (*Id.* ¶ 5; *Diversity in Faces* at 2, 7.)  The researchers implemented ten "facial

15   coding schemes" to measure aspects of the facial features of the individuals pictured in

16   the photos, such as "craniofacial distances, areas and ratios, facial symmetry and contrast,

17   skin color, age and gender predictions, subjective annotations, and pose and resolution."

18   (*Diversity in Faces* at 9.)  A statistical analysis of these coding schemes "provided insight

19   into how various dimensions . . . provide indications of dataset diversity." (Merler Decl.

20

21          [5] All of the researchers involved in creating the DiF Dataset were based in and worked
     out of IBM's office in Yorktown Heights, New York; and the work was performed on and stored
22   on IBM Research computer servers in Poughkeepsie, New York.  (*Id.* ¶ 8.)  None of the work
     involved computers or systems located in Illinois.  (*Id.*)

¶ 6.)  The coding schemes implemented by the IBM researchers were intended to enable other researchers to develop techniques to estimate diversity in their own datasets, with the goal of mitigating dataset bias, and were "never intended to identify any particular individual."  (*Id.* ¶ 7.)  Rather, the coding schemes were "purely descriptive and designed to provide a mechanism to evaluate diversity in the dataset."  (*Id.*)

IBM provided the DiF Dataset free of charge to researchers who filled out a questionnaire and submitted it to IBM via email.  (*Id.* ¶¶ 4, 9.)  The questionnaire required the researcher to verify

> (i) that he/she would only use the DiF Dataset for research purposes, and (ii) that he/she had read and agreed to the DiF Dataset terms of use, which made clear that the DiF Dataset could only be used for non-commercial, research purposes and prohibited using the DiF Dataset to identify any individuals in images associated with URLs in the DiF Dataset.

(*Id.* ¶ 9; *see also id.* ¶ 11, Ex. H (DiF Dataset terms of use); 7/26/22 Drury Decl. ¶ 25, Ex. 24 (Amazon's completed questionnaire).)  After verifying that a request was for a "legitimate research purpose," IBM researcher Dr. Michele Merler sent the DiF Dataset to the requesting researcher "via an email that included a link to a temporary Box folder that contained the DiF Dataset."  (Merler Decl. ¶ 10.)

2.      Plaintiffs' Photos in the DiF Dataset

The DiF Dataset includes at least 61 of the nearly 19,000 public photos that Mr. Vance uploaded to Flickr.  (Vance Dep. at 179:22-23, 210:19-24.)  Mr. Vance appears in some of the photos in the DiF Dataset; other photos depict people whose state of residence was unknown to Mr. Vance and at least one depicts individuals who themselves were unknown to Mr. Vance.  (*Id.* at 132:4-14; 154:5-16.)

1    The DiF Dataset includes 24 of the 1,669 public photos that Mr. Janecyk uploaded

2    to Flickr.  (Janecyk Dep. at 74:21-24, 95:22-96:1.)  Mr. Janecyk appears in at least one of

3    the photos.  (*Id.* at 99:21-100:6.)  Because Mr. Janecyk photographed people on the

4    streets of Chicago, however, he does not know the names or places of residence of the

5    individuals depicted in most of his photos.  (*Id.* at 45:16-46:19, 98:8-100:13,

6    167:11-168:15, 228:19-21.)

7    <u>3.</u>    <u>Amazon's Downloads of the DiF Dataset</u>

8    Amazon has developed a publicly-available commercial facial-recognition product

9    called Rekognition.  (*See* Compl. ¶ 55.)  The team that was responsible for implementing,

10   developing, and researching the facial recognition technology in Rekognition is a

11   subgroup of what was known as the Amazon Web Services ("AWS") AI science team

12   (the "Rekognition Team").  (Sephus Dep.[6] at 21:20-24; 22:8-21.)

13   In 2018 and 2019, multiple studies reported that Rekognition had a high rate of

14   errors in classifying women and people of color, with a particular weakness in classifying

15   the gender of dark-skinned women.  (*See* 7/26/22 Drury Decl. ¶ 10, Ex. 9 (Jacob Snow,

16   *Amazon's Face Recognition Falsely Matched 28 Members of Congress with Mugshots*,

17   ACLU (July 26, 2018), https://www.aclu.org/news/privacy-technology/amazons-face-

18   recognition-falsely-matched-28 ("ACLU Report")); *id.* ¶ 13, Ex. 12 (Joy Buolomwini, *et*

19   *al.*, *Gender Shades: Intersectional Accuracy Disparities in Commercial Gender*

20

21   [6] Both parties have submitted excerpts from Dr. Nashlie Sephus's deposition.  (*See*
     5/19/22 Wiese Decl. (Dkt. # 112) ¶ 6, Ex. 5; 7/26/22 Drury Decl. ¶ 12, Ex. 11 (Dkt. ## 119-3
22   (sealed), 124-11 (redacted)).)  For ease of reference, the court cites directly to the page and line
     number of the deposition.

*Classification*, Proc. of Mach. Learning Rsch, no. 81, 2018, at 77 ("*Gender Shades*")); *id.*

¶ 14, Ex. 13 (Inioluwa Deborah Raji, *et al.*, *Actionable Auditing: Investigating the Impact*

*of Publicly Naming Biased Performance Results of AI Productions*, Proc. of the 2019

AAAI/ACM Conf. on AI, Ethics, & Soc'y, Jan. 2019, at 429).)

   In January 2019, Dr. Tal Hassner, an AWS Principal Scientist who had been hired

to help improve the accuracy of Rekognition's facial recognition service, asked his

manager, Dr. Stefano Soatto, Director of AWS's AI Computer Vision Science

Organization (the "Research Team"), if he could request access to the DiF Dataset to

determine whether the dataset would be suitable for a research project involving fairness

and bias in machine learning.  (Soatto Decl. (Dkt. # 64) ¶ 3; Hassner Dep.[7] at 74:8-19,

125:8-15.)  Dr. Soatto approved the request.  (Soatto Decl. ¶ 3.)  Dr. Soatto and Dr.

Hassner worked in California at the time.  (Soatto Decl. ¶ 1; Hassner Decl. (Dkt. # 69)

¶ 1.)

   On February 1, 2019, Dr. Hassner sent IBM's Dr. Merler an email stating that he

was interested in using the DiF Dataset for "research and internal testing."  (7/26/22

Drury Decl. ¶ 23, Ex. 22.)  Dr. Merler responded that the DiF Dataset was meant for

research purposes only and directed Dr. Hassner to complete IBM's questionnaire.  (*Id.*)

Dr. Hassner did so on February 9, 2019.  (7/26/22 Drury Decl. ¶¶ 24-25, Exs. 23-24 (Dr.

Hassner's questionnaire and cover letter).)  IBM approved the request and sent him a link

---

   [7] Both parties have submitted excerpts from Dr. Tal Hassner's deposition.  (*See* 5/19/22
Wiese Decl. ¶ 3, Ex. 2; 7/26/22 Drury Decl. ¶ 22, Ex. 21.)  For ease of reference, the court cites
directly to the page and line number of the deposition.

to download Version 1A of the DiF Dataset.  (*Id.* ¶ 26, Ex. 25 at 2-3; Hassner Decl. ¶ 4.)
Dr. Hassner did not, however, personally download the DiF Dataset.  (Hassner Decl. ¶ 7.)

In response to an email from Dr. Soatto, Dr. Pietro Perona, an Amazon Fellow
with AWS who was based in California, stated that he was downloading the dataset and
would "create a bucker [*sic*] and put it there."  (Perona Decl. (Dkt. # 127) ¶ 1; 7/26/22
Drury Decl., Ex. 25 at 1.)  Dr. Perona, however, did not download the DiF Dataset
because it was very large; instead, Dr. Yuanjun Xiong, a junior member of the research
team, downloaded the Dataset.  (Perona Decl. ¶ 4; *see also* Xia Dep.[8] at 46:19-47:24
(stating Dr. Xiong downloaded the dataset because Dr. Perona was not familiar with the
AWS services).)

In February 2019, Dr. Xiong, then an AWS Senior Applied Scientist based in
Seattle, Washington, downloaded Version 1A of the DiF Dataset to the Research Team's
cloud-based "virtual machine" (the "Amazon EBS"), which was physically located in
AWS's data center in Oregon.  (Xiong Decl. (Dkt. # 65) ¶¶ 1, 4; *see also* Xiong Dep.[9] at
108:8-114:6 (explaining the Amazon EBS); Xia Dep. at 21:10-23 (explaining that
because the Research Team was on the West Coast, the Oregon data center provided the
"least latency from communication").)  Version 1A of the DiF Dataset was then stored to

---

[8] Both parties have submitted excerpts from Dr. Wei Xia's deposition.  (*See* 5/19/22
Wiese Decl. ¶ 7, Ex. 6; 7/26/22 Drury Decl. ¶ 28, Ex. 27; 7/29/22 Wiese Decl. (Dkt. # 126) ¶ 3,
Ex. 8.)  For ease of reference, the court cites directly to the page and line number of the
deposition.

[9] Both parties have submitted excerpts from Dr. Yuanjun Xiong's deposition.  (*See*
5/19/22 Wiese Decl. ¶ 5, Ex. 4; 7/26/22 Drury Decl. ¶ 19, Ex. 18 (Dkt. ## 119-4 (sealed), 124-18
(redacted)); 7/29/22 Wiese Decl. ¶ 2, Ex. 7.)  For ease of reference, the court cites directly to the
page and line number of the deposition.

1  the Research Team's "S3 Bucket," a specific cloud storage location also physically

2  located in the Oregon data center.  (Xiong Decl. ¶ 5; *see also* Xiong Dep. at

3  120:25-122:20, 125:22-126:6 (explaining the S3 Bucket).)  Access to the S3 Bucket was

4  restricted to the approximately 50 members of the Research Team.  (Xiong Decl. ¶ 5.)

5        Dr. Xiong evaluated Version 1A to determine whether it would be suitable for "the

6  Research Team's project involving fairness and bias in machine learning models."  (*Id.*

7  ¶ 6; *see also* Xiong Dep. 67:2-73:15, 131:10-132:9, 154:17-155:1 (explaining the process

8  he used to evaluate the dataset).)  The evaluation included running Rekognition's

9  computer vision model on the DiF Dataset.  (Xiong Dep. at 70:24-71:18; *see also* 7/26/22

10  Drury Decl.; *id.* ¶ 29, Ex. 28 (Dkt. ## 119-6 (sealed), 124-28 (redacted)) (February 20 to

11  March 4, 2019 email thread including Dr. Perona, Dr. Hassner, Dr. Soatto, and Dr. Wei

12  Xia, discussing plan to "run gender classification" on the DiF Dataset and the results

13  thereof); *id.* ¶ 31, Ex. 30 (Dkt. ## 119-7 (sealed), 124-30 (redacted)) (April 5, 2019 email

14  from Dr. Perona, stating that a "careful study of the errors and bias" of Rekognition on

15  the DiF Dataset was part of a "high priority" project.)  In addition, at some point Dr.

16  Xiong may have added hair length annotations to a subset of the DiF Dataset to help

17  identify hidden variables that could affect the accuracy of gender classifications in the

18  dataset.  (*See* Xiong Dep. 202:1-203:11; Sephus Dep. at 37:15-39-7 (explaining why hair

19  length annotations would be useful in evaluating a dataset); *id.* at 170:1-172-2 (discussing

20  the subset).)

21        After his evaluation, Dr. Xiong discussed the results with Dr. Soatto and Dr. Wei

22  Xia, a founding scientist of Rekognition and leader of the Research Team based in

1   Seattle, Washington.  (Xiong Decl. ¶ 6; Xia Decl. (Dkt. # 66) ¶¶ 2, 6.)  They determined

2   that the DiF Dataset was not suitable for the Research Team's purposes because it "was

3   not a demographically balanced dataset and its demographic annotations were

4   unreliable."  (Xiong Decl. ¶ 7; Xia Decl. ¶ 6; *see also* Xiong Dep. at 69:17-25,

5   140:19-143:10 (testifying that the DiF Dataset was not "well balanced" and had too many

6   errors to be useful).)  Dr. Xiong did not make any further use of Version 1A and is not

7   aware of anyone else on the Research Team using Version 1A.  (Xiong Decl. ¶ 8; *see*

8   *also* Xia Decl. ¶¶ 2, 10 (stating that as lead of the Research Team, he is not aware of

9   anyone else on the Research Team accessing or using the DiF Dataset after Dr. Xiong's

10  evaluation); Xiong Dep. at 70:16-73:15, 275:19-276:14 (testifying that he did not train

11  Rekognition on the DiF dataset or use the dataset to improve Rekognition); *see also*

12  Soatto Decl. ¶ 6 (stating that, to his knowledge, no version of the DiF Dataset was ever

13  used or integrated into any Amazon product or service including Rekognition).)

14          In March 2019, Dr. Xiong provided access to Version 1A of the DiF Dataset

15  stored on the S3 Bucket to Dr. Michele Donini, an AWS Applied Scientist II based in

16  Seattle, Washington.  (Xiong Decl. ¶ 9; Donini Decl. (Dkt. # 67) ¶ 1.)  Dr. Donini was

17  collaborating with Dr. Xiong and Dr. Xia but was not a member of the Research Team.

18  (Donini Decl. ¶ 3.)  Dr. Donini saved a local copy of the dataset on his Amazon-issued

19  laptop.  (*Id.* ¶ 4.)  He examined the local copy of the DiF Dataset and determined that the

20  dataset was not suitable for his research purposes because "the demographic group

21  information was not sufficiently defined for [his] methods."  (*Id.* ¶ 5; *see also* 5/19/22

22  Wiese Decl. ¶ 2, Ex. 1 ("Donini Dep.") at 43:23-25, 58:17-61:6, 141:7-23 (explaining his

1   evaluation process and results).)  He does not recall deleting his local copy of the DiF

2   Dataset, although his normal practice would have been to do so.  (Donini Decl. ¶ 6;

3   Donini Dep. at 109:5-10.)  In February 2020, Dr. Donini transferred to Amazon's office

4   in Berlin, Germany.  (Donini Decl. ¶ 7.)  Before doing so, he returned his Amazon-issued

5   laptop to Amazon in Seattle, Washington, where it was wiped clean before being

6   reassigned to another user.  (*Id.*; *see also* Donini Dep. at 113:9-18 (stating he checked

7   with Amazon IT staff to ensure that they wiped his laptop).)  He is not aware of any

8   version of the DiF Dataset being used by Amazon or integrated into any Amazon

9   product.  (Donini Decl. ¶ 9.)

10         On April 8, 2019, IBM notified Dr. Hassner by email that Version 1B of the DiF

11   Dataset was available, and Dr. Hassner forwarded the information to Dr. Xiong.  (Xiong

12   Decl. ¶ 10; Xiong Dep. at 251:8-11.)  As IBM had instructed in its email, Dr. Xiong

13   deleted Version 1A from the Amazon EBS and the S3 Bucket.  (Xiong Decl. ¶ 11.)  He

14   then downloaded Version 1B to the Amazon EBS and the S3 Bucket.  (*Id.* ¶ 12.)  He did

15   not evaluate or use Version 1B of the DiF Dataset and is not aware of any member of the

16   Research Team using or accessing Version 1B.  (*Id.* ¶ 14; Xiong Dep. at 265:21-266:9.)

17   He deleted Version 1B of the DiF Dataset from the Amazon EBS and the S3 Bucket in

18   late 2019 or 2020.  (Xiong Decl. ¶ 15.)  To his knowledge, no version of the DiF Dataset

19   was ever used by Amazon in its products, nor was any information from the DiF Dataset

20   integrated into any Amazon product or service.  (*Id.* ¶ 16; Xiong Dep. at 273:12-20.)

21         Dr. Nashlie Sephus, an AWS Applied Science Manager based in Atlanta, Georgia,

22   was responsible for auditing and testing Rekognition for biases in gender classification.

(Sephus Decl. (Dkt. # 68) ¶¶ 1-2; Sephus Dep. at 68:22-69:12.)  According to Dr. Sephus, her work was a high priority for Amazon due to the publication of the reports criticizing Rekognition's ability to classify the gender of dark-skinned women.  (Sephus Dep. at 70:2-7, 100:10-103:13; *see also* 7/26/22 Drury Decl. ¶ 21, Ex. 20 ("Sephus Profile") (describing Dr. Sephus's role in improving the accuracy of Rekognition, particularly with respect to "diverse genders and races"[10]).)  In April 2019, Dr. Xiong provided Dr. Sephus, who was not a member of the Research Team, with access to Version 1B of the DiF Dataset stored on the S3 Bucket.  (Xiong Decl. ¶ 13; Sephus Decl. ¶ 3.)  Working directly with the version of the DiF Dataset on the S3 Bucket, she looked at its demographic annotations and "quickly determined the dataset was not suitable for [her] research purposes because the dataset was not sufficiently demographically balanced." (Sephus Decl. ¶ 4; *see also* Sephus Dep. at 41:2-10, 41:18-42:5, 95:6-96:1, 96:23-97:11, 129:8-22, 131:6-15 (describing her evaluation and the problems she identified in the DiF Dataset).)  Dr. Sephus later wrote a presentation that described some of the mislabeling errors she found in the DiF Dataset and cited those errors in a paper she wrote about gender classification but did not otherwise access or use any version of the DiF Dataset in any research.  (Sephus Decl. ¶ 5; Sephus Dep. at 97:12-18, 132:8-10, 141:19-24.)  She is not aware of Amazon using any version of the DiF Dataset to train Rekognition or

---

[10] This profile includes a reference to the *Diversity in Faces* study, stating that the study "showed that many existing large scale face databases were biased toward 'lighter skin' faces" and explaining that this bias can be "problematic" because "algorithms trained on faces with a 'lighter skin' will not do a good job of identifying darker faces." (*Id.* at 1.)  The profile does not state that Dr. Sephus used the DiF Dataset in her research.  (*Id.* at 1-2.)

1    integrating any information from the DiF Dataset into any Amazon product, including

2    Rekognition.  (Sephus Decl. ¶ 5; Sephus Dep. at 144:20-145:2.)

3    **B.    Relevant Procedural Background**

4         Plaintiffs filed their proposed class complaint in this action on July 14, 2020.

5    (Compl.)  They brought claims against Amazon for violations of two provisions of

6    Illinois's Biometric Information Privacy Act, 740 ILCS § 14/1, *et seq.* ("BIPA"), unjust

7    enrichment, and injunctive relief.  (*Id.* ¶¶ 99-128.)  With respect to the BIPA violations,

8    Plaintiffs alleged that Amazon (1) violated BIPA § 15(b) by collecting and obtaining

9    their biometric data without providing required information or obtaining written releases,

10   and (2) violated BIPA § 15(c) by unlawfully profiting from Plaintiffs' biometric data.

11   (*Id.* ¶¶ 99-112.)

12        On September 14, 2020, Amazon moved to dismiss Plaintiffs' claims.  (MTD

13   (Dkt. # 18).)  On March 15, 2021, the court granted in part and denied in part Amazon's

14   motion to dismiss.  (3/15/21 Order (Dkt. # 34).)  The court (1) granted Amazon's motion

15   to dismiss Plaintiffs' injunctive relief claim on the ground that injunctive relief is not a

16   standalone cause of action; (2) denied Amazon's motion to dismiss Plaintiffs' BIPA

17   § 15(b) claim, concluding that Plaintiffs had sufficiently alleged the elements of the

18   claim; and (3) deferred ruling on Amazon's motion to dismiss Plaintiffs' BIPA § 15(c)

19   and unjust enrichment claims pending the receipt of supplemental briefing.  (*See*

20   *generally id.*)  On April 14, 2021, after reviewing the parties' supplemental briefing and

21   hearing oral argument, the court denied Amazon's motion to dismiss Plaintiffs' BIPA

22

1  § 15(c) and unjust enrichment claims.  (*See* 4/13/21 Min. Entry (Dkt. # 37); 4/14/21

2  Order (Dkt. # 38).)

3       Amazon filed its original motion for summary judgment on December 10, 2021.

4  (1st MSJ (Dkt. # 62).)  On February 8, 2022, the court granted in part Plaintiffs' motion

5  for additional discovery pursuant to Federal Rule of Civil Procedure 56(d) and struck

6  Amazon's original motion for summary judgment without prejudice.  (2/8/22 Order (Dkt.

7  # 97); *see also* Pls. 56(d) Mot. (Dkt. # 81).)

8       On May 19, 2022, Amazon filed the instant renewed motion for summary

9  judgment.  (*See* Mot.)  Subsequently, the parties agreed to a stipulated briefing schedule

10  to accommodate additional discovery in *Vance v. Microsoft Corporation*,

11  No. C20-1082JLR (W.D. Wash.), which the court had set to run on a parallel schedule

12  with this matter.  (5/27/22 Stip. (Dkt. # 113) (citing 5/17/21 Min. Entry (Dkt. # 40)).)

13  Thus, this motion became ripe for decision on July 29, 2022.  (*Id.*)

14               **III.    ANALYSIS**

15       Amazon argues that summary judgment on Plaintiffs' claims is warranted because

16  (1) BIPA cannot apply extraterritorially to its conduct outside of Illinois as a matter of

17  Illinois law; (2) applying BIPA to Amazon's conduct would violate the dormant

18  Commerce Clause of the United States Constitution; (3) even if BIPA could apply to

19  Amazon's out-of-state conduct, Plaintiffs cannot prove the elements of their BIPA

20  § 15(b) and § 15(c) claims; and (4) Plaintiffs cannot prove the elements of their unjust

21  enrichment claim.  (*See generally* Mot.)  Below, the court sets forth the standard for

22  evaluating motions for summary judgment before considering Amazon's motion.

ORDER - 13

1    **A.      Summary Judgment Standard**

2           Under Rule 56 of the Federal Rules of Civil Procedure, either "party may move

3    for summary judgment, identifying each claim or defense—or the part of each claim or

4    defense—on which summary judgment is sought." Fed. R. Civ. P. 56.  Summary

5    judgment is appropriate if the evidence, when viewed in the light most favorable to the

6    non-moving party, demonstrates "that there is no genuine dispute as to any material fact

7    and the movant is entitled to judgment as a matter of law." *Id.*; *see Celotex Corp. v.*

8    *Catrett*, 477 U.S. 317, 322 (1986).  A dispute is "genuine" if "the evidence is such that a

9    reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

10   *Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the

11   outcome of the suit under the governing law." *Id.*

12          The moving party bears the initial burden of showing that there is no genuine

13   dispute of material fact and that it is entitled to prevail as a matter of law.  *Celotex*, 477

14   U.S. at 323.  If the moving party does not bear the ultimate burden of persuasion at trial,

15   it nevertheless "has both the initial burden of production and the ultimate burden of

16   persuasion on a motion for summary judgment." *Nissan Fire & Marine Ins. Co. v. Fritz*

17   *Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  "In order to carry its burden of

18   production, the moving party must either produce evidence negating an essential element

19   of the nonmoving party's claim or defense or show that the nonmoving party does not

20   have enough evidence of an essential element to carry its ultimate burden of persuasion at

21   trial." *Id.*  If the moving party meets its burden of production, the burden then shifts to

22   the nonmoving party to identify specific facts from which a factfinder could reasonably

1    find in the nonmoving party's favor.  *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at

2    250.

3          The court is "required to view the facts and draw reasonable inferences in the light

4    most favorable to the [nonmoving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

5    The court may not weigh evidence or make credibility determinations in analyzing a

6    motion for summary judgment because these are "jury functions, not those of a judge."

7    *Anderson*, 477 U.S. at 249-50.  Nevertheless, the nonmoving party "must do more than

8    simply show that there is some metaphysical doubt as to the material facts . . . .  Where

9    the record taken as a whole could not lead a rational trier of fact to find for the

10   nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (quoting

11   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal

12   quotation marks omitted)).

13   **B.    Extraterritoriality Doctrine**

14         Under Illinois law, a "statute is without extraterritorial effect unless a clear intent

15   in this respect appears from the express provisions of the statute." *Avery v. State Farm*

16   *Mut. Ins. Co.*, 835 N.E.2d 801, 852 (Ill. 2005) (quoting *Dur-Ite Co. v. Indus. Comm'n*, 68

17   N.E.2d 717 (Ill. 1946) (internal quotation marks omitted)).  Because BIPA does not

18   contain such an express provision, it does not apply extraterritorially to conduct outside

19   of Illinois. *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1100 (N.D. Ill. 2017); (*see*

20   3/15/21 Order at 6).  Thus, to survive summary judgment, Plaintiffs must show a genuine

21   issue of material fact regarding whether the circumstances underlying their BIPA claims

22

1    "occurred primarily and substantially in Illinois." *Avery*, 835 N.E.2d at 854; (*see also*

2    3/15/21 Order at 6).

3         Amazon asserts that Illinois's extraterritoriality doctrine bars Plaintiffs' BIPA

4    claims because none of its conduct relating to those claims took place in Illinois.  (Mot. at

5    11-12.)  Rather, its relevant conduct—downloading, reviewing, and evaluating the DiF

6    Dataset—took place in Washington and Georgia.  (*Id.* at 12-16.)  Thus, according to

7    Amazon, Plaintiffs cannot prove that its conduct "occurred primarily and substantially in

8    Illinois."  (*Id.* (citing *Avery*, 835 N.E.2d at 854).)  Plaintiffs, for their part, counter that

9    the extraterritoriality doctrine does not apply because Amazon's "unlawful conduct

10   occurred in Illinois."  (Resp. at 10-15.)  The court agrees with Amazon that the

11   extraterritoriality doctrine bars Plaintiffs' BIPA claims as a matter of law.

12        Plaintiffs have not met their burden at summary judgment to establish a genuine

13   issue of material fact regarding whether Amazon's relevant conduct "occurred primarily

14   and substantially in Illinois." *Avery*, 835 N.E.2d at 854.  First, Plaintiffs rely on the

15   court's order denying Amazon's motion to dismiss, in which the court identified the

16   allegations in Plaintiffs' complaint that precluded dismissal on extraterritoriality grounds.

17   (Resp. at 11 (quoting 3/15/21 Order at 8).)  At summary judgment, however, Plaintiffs

18   can no longer rest on their allegations.  Instead, they must identify evidence sufficient to

19   establish a genuine issue of material fact regarding whether the circumstances giving rise

20   to their claims occurred "primarily and substantially in Illinois." *Avery*, 835 N.E.2d at

21   854.  As discussed below, they have not met this burden.

22

1    Second, Plaintiffs contend that the extraterritoriality doctrine does not bar their

2    claims because (1) Plaintiffs resided in Illinois "at relevant times"; (2) Plaintiffs' photos

3    "from which their biometric data was collected, captured, and obtained were taken in

4    Illinois and uploaded to the Internet in Illinois"; and (3) Plaintiffs' injuries occurred in

5    Illinois.  (Resp. at 12-13.)  Plaintiffs have not, however, identified any conduct by

6    *Amazon* that took place either primarily or substantially in Illinois.  (*See generally id*.)

7    The court agrees with Amazon that the facts upon which Plaintiffs rely show that the only

8    connection this case has to Illinois is through Plaintiffs' residence and actions in Illinois.

9    (*See* Reply at 2.)

10    The cases Plaintiffs cite in support of their argument that claims "relating to

11    photos taken and uploaded to the internet in Illinois" necessarily survive the

12    extraterritoriality doctrine are all distinguishable from the present case.  (*See* Resp. at 13.)

13    In *In re Facebook Biometric Info. Privacy Litig.*, 326 F.R.D. 535, 547 (N.D. Cal. 2018),

14    for example, the plaintiff Illinois residents uploaded their photos to Facebook's social

15    media service in Illinois.  Facebook then scanned the photos, identified the individuals in

16    those photos, and suggested names of individuals to tag in those photos.  *Id.*  Thus,

17    Facebook reached into Illinois by providing its service to the plaintiffs, and the plaintiffs'

18    direct interactions with Facebook gave rise to the alleged BIPA violations.  *See id.*

19    (noting that Facebook had not "tendered any evidence" that the circumstances relating to

20    its conduct did not occur "primarily and substantially within" Illinois); *id.* at 549

21    (granting the plaintiffs' motion for class certification).

22

Plaintiffs' remaining citations are to decisions denying motions to dismiss.  (*See* Resp. at 13.)  In *In re Clearview AI, Inc. Consumer Privacy Litigation*, 585 F. Supp. 3d 1111, 1118, 1121 (N.D. Ill. 2022), *clarified on denial of reconsideration by* 2022 WL 2915627 (N.D. Ill. July 25, 2022), the court observed, in denying the defendants' motion to dismiss on extraterritoriality grounds, that the plaintiffs had alleged that the defendants "trespassed on the Illinois subclass members' private domains in Illinois," "contracted with hundreds of Illinois entities, both public and private," and "used artificial intelligence algorithms to scan the face geometry of each individual depicted to harvest the individuals' unique biometric identifiers."  *Rivera v. Google, Inc.*, 238 F. Supp. 3d 1088, 1091 (N.D. Ill. 2017), involved a challenge to Google's alleged practice of automatically uploading photos taken by Illinois residents on Google Droid devices in Illinois to its Google Photos service; immediately scanning the photos to create "templates" that mapped the Illinois plaintiffs' "distinct facial measurements"; and then using those templates to "find and group together other photos of" the Illinois plaintiffs. Similarly, in *Monroy v. Shutterfly, Inc.*, No. 16 C 10984, 2017 WL 4099846, at *1 (N.D. Ill. Sept. 15, 2017), the Illinois plaintiff alleged that when he uploaded a photo to Shutterfly's website, Shutterfly's facial recognition software scanned the image, located the faces in the image, and extracted a template for each face that could be used to identify the persons in the photo.  In all of these cases, the plaintiffs alleged that the defendant itself reached into Illinois to collect their photographs, scan the photographs, and/or generate facial measurements or templates for use in facial recognition systems without the plaintiffs' consent.

1          Here, in contrast, there is no dispute that other entities—rather than Amazon—

2   were responsible for the collection of the photographs, the scanning of the photographs,

3   and the generation of facial measurements or templates.  (*See, e.g.*, Resp. at 4-5

4   (describing the conduct of Flickr, Yahoo, and IBM in collecting photos, creating datasets,

5   and generating facial measurements); *see id.* at 2-10 (describing Amazon's conduct in

6   downloading and evaluating the DiF dataset).)  Furthermore, Plaintiffs identify no

7   evidence that any of the Amazon employees had any relevant connection to Illinois, let

8   alone downloaded, reviewed, or evaluated the DiF Dataset in Illinois.  (*See generally id.*)

9   As a result, this case is akin to *McGoveran v. Amazon Web Services, Inc.*, C.A. No. 20-

10  13399-LPS, 2021 WL 4502089, at *4 (D. Del. Sept. 30, 2021), in which the court noted

11  that the plaintiffs' allegations about the case's connections to Illinois were "nothing more

12  than repeated statements (phrased three different ways) about Plaintiffs' residency" and

13  granted AWS's motion to dismiss under the extraterritoriality doctrine.

14         The court concludes that any connection between Amazon's conduct and Illinois

15  is too attenuated for a reasonable juror to find that the circumstances underlying

16  Amazon's alleged BIPA violations "occurred primarily and substantially in Illinois."

17  *Avery*, 835 N.E.2d at 854; *see also McGoveran*, 2021 WL 4502089, at *4-6.  Therefore,

18  the court GRANTS Amazon's motion for summary judgment on Plaintiffs' BIPA

19  claims.[11]

20

21         [11] Because the court grants Amazon's motion for summary judgment on extraterritoriality
    grounds, it need not address Amazon's argument that the extraterritorial application of BIPA in
    this case would violate the Dormant Commerce Clause or Amazon's specific arguments relating
22  to BIPA § 15(b) and § 15(c).

1     **B.     Unjust Enrichment**

2         To prevail on a claim for unjust enrichment under Illinois law,[12] a plaintiff must

3     prove (1) that the defendant has unjustly retained a benefit to the plaintiff's detriment and

4     (2) that the defendant's retention of the benefit "violates the fundamental principles of

5     justice, equity, and good conscience." *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp.,*

6     *Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). Plaintiffs alleged that Amazon "profited off of

7     Plaintiffs' . . . biometric identifiers and information, while exposing Plaintiffs . . . to a

8     heightened risk of privacy and informational harms and depriving them of their control

9     over their biometric data." (Compl. ¶ 114.) They further alleged, "under the principles

10    of equity and good conscience," that Amazon "obtained Plaintiffs' . . . biometric

11    identifiers and information through inequitable means in that it obtained biometric data

12    from Plaintiffs' . . . online photographs without permission and in violation of Illinois

13    law." (*Id.* ¶ 118.) They contend that Amazon "should not be permitted to retain the

14    biometric identifiers and information belonging to Plaintiffs . . . because [Amazon]

15    unlawfully obtained the biometric identifiers and information." (*Id.* ¶ 121.)

16        Amazon argues that it is entitled to summary judgment on Plaintiffs' unjust

17    enrichment claim because, it asserts, the undisputed evidence shows that it "did nothing

18    with the DiF Dataset beyond its initial evaluation and determination that the Dataset

19    would not be useful for research." (Mot. at 23-24.) Thus, it retained no benefit or profit

20    from Plaintiffs' biometric identifiers or information. (*Id.* at 23; *see also* Reply at 12

21

22        [12] The court previously determined that Illinois law governed Plaintiffs' unjust
enrichment claim. (4/14/21 Order at 21.)

1   (arguing that Amazon "did not retain a benefit because it merely downloaded, evaluated,

2   and then deleted the Dataset, without using it to improve any product or service,

3   including Rekognition").)  Plaintiffs counter that summary judgment is precluded

4   because (1) "numerous members of the Rekognition Team accessed and used the DiF

5   [D]ataset over an extended period"; (2) Amazon ran tests using the DiF Dataset's

6   annotations; (3) Amazon created its own annotations; and (4) Amazon obtained the

7   dataset to "improve Rekognition in the wake of negative publicity regarding it[s] high

8   error rates."  (Resp. at 23-24.)

9        Viewing the evidence in the light most favorable to Plaintiffs, the court concludes

10   Plaintiffs have not met their burden to identify specific facts from which a jury could

11   reasonably find that Amazon unjustly retained a benefit to Plaintiffs' detriment.  Rather,

12   Plaintiffs present only speculation—rather than evidence—that Amazon somehow used

13   the DiF Dataset to improve its Rekognition product.  For example, Plaintiffs make much

14   of Dr. Sephus's testimony that error rates in Rekognition were "significantly improved"

15   after *Gender Shades* and the ACLU Report identified the problems with that product.

16   (Resp. at 5-6 (first citing Sephus Dep. at 76:13-77:3, 86:13-87:22; and then citing Sephus

17   Profile at 2).)  At no point, however, do they offer evidence, as opposed to speculation, to

18   connect that improvement with Amazon's use of the DiF Dataset to test or train

19   Rekognition.  (*See generally id.*)  In addition, although Plaintiffs point to statements by

20   Dr. Soatto and Dr. Perona about the priority of evaluating the DiF Dataset soon after Dr.

21   Xiong downloaded it and the researchers' addition of hair length annotations to the

22   dataset (*see id.* at 9), they again present no evidence—as opposed to speculation—that

1    would contradict the Amazon researchers' testimony that Amazon did not train

2    Rekognition on the DiF Dataset and did not integrate the DiF Dataset into Rekognition or

3    any other Amazon product.  (*See generally id.*; *see* Soatto Decl. ¶ 6, Xia Decl. ¶ 11, Xia

4    Dep. at 42:3-17; Xiong Decl. ¶ 16; Xiong Dep. at 272:18-273:20; Donini Decl. ¶ 9;

5    Sephus Decl. ¶ 5; Hassner Decl. ¶ 7.)  Because Plaintiffs rely on speculation, rather than

6    evidence, that Amazon unjustly retained a benefit from their biometric information

7    included in the DiF Dataset, *see Brit. Airways Bd. v. Boeing Co.*, 585 F.2d 946, 954 (9th

8    Cir. 1978) (holding that "supposition, speculation, and conclusory argument of counsel"

9    does not suffice to create a genuine fact dispute), the court GRANTS Amazon's motion

10   for summary judgment on Plaintiffs' unjust enrichment claim.[13]

11                                    **IV.    CONCLUSION**

12           For the foregoing reasons, the court GRANTS Amazon's motion for summary

13   judgment (Dkt. # 111).  Because this order relies on materials that have been filed under

14   seal, the court DIRECTS the clerk to provisionally file this order under seal.  The court

15   ORDERS counsel to meet and confer regarding the need for redaction and to jointly file a

16   statement on the docket within fourteen (14) days of the date of this order to indicate any

17   such need.

18   //

19   //

20

21           [13] For the same reasons, the court concludes that the result would be the same if
     Washington law applied to Plaintiffs' unjust enrichment claim.  *See Cousineau v. Microsoft*, 992
22   F. Supp. 2d 1116, 1129 (W.D. Wash. 2012) (setting forth the elements of an unjust enrichment
     claim under Washington law).

1    Dated this 17th day of October, 2022.

2

3    _____

4    JAMES L. ROBART
     United States District Judge

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22